**UNITED STATES of America**

v.

**Mohammad SALAMEH, a/k/a "Kamal Ibraham,"**

**Nidal Ayyad, Mahmoud Abouhalima, and Ahmad Mohammad Ajaj, a/k/a "Khurram Khan," Defendants.**

**No. 93 CR. 180 KTD.**

United States District Court, S.D. New York.

June 21, 1999.

238

Mary Jo White, United States Attorney, Southern District of New York, New York City, Asst.U.S.Atty. David N. Kelley, Asst. U.S.Atty. Michael J. Garcia, Special Asst. U.S.Atty., Lev Dassin, for U.S.

Frank Handelman, New York City, for Mohammed Salameh, defendant.

Francisco Celedonio, New York City, for Nidal Ayyad, defendant.

Lawrence Mark Stern, New York City, for Mahmoud Abouhalima, defendant.

Maranda E. Fritz, Fritz & Miller, New York City, for defendant Ahmad Mohammad Ajaj.

## *OPINION*

DUFFY, District Judge.

## TABLE OF CONTENTS

FACTUAL BACKGROUND ........................................... 246
 I. The Evidence at Trial ...................................... 246
 A. Ahmad Mohammad Ajaj ............................ 246
 B. Mohammad Salameh .............................. 246
 C. Mahmoud Abouhalima ............................ 247
 D. Nidal Ayyad .................................... 247
 II. The Rule 33 Motions ...................................... 247
DISCUSSION ..................................................... 248
AYYAD'S CLAIMS ................................................ 249
 I. Trial Counsel's Lack of Federal Criminal Practice Experience ................. 250
 II. Trial Counsel's Failure to Consult or Retain Various Expert Witnesses .......... 250

III. Trial Counsel's Alleged Ineffective Motion Practice and Preparation for Defense Case .................................................................252
IV. Trial Counsel's Alleged Ineffective Trial Conduct...............................253
 A. The In–Court Identification ..............................................253
 B. Cross–Examination ...................................................253
 C. Summation......................................................254
ABOUHALIMA'S MOTION ................................................255
 I. Allegations of Newly Discovered Evidence of False Trial Testimony by Special Agent David Williams.................................................255
 A. Overview of Dr. Frederic Whitehurst's Hearing Testimony and the Inspector General's Report ..........................................257
 1. Whitehurst's Background and Initial Involvement in the World Trade Center Investigation .......................................257
 2. Whitehurst's Concerns Regarding the Urea Nitrate Theory.............257
 3. Whitehurst's Disagreements with His Superiors ......................258
 a. The April Report .....................................258
 b. The Attempt to Alter Whitehurst's Dictation ....................258
 c. The July Report......................................259
 4. The Haldimann Episode ...........................................259
 5. Criticisms of Williams' Testimony ..................................260
 a. Criticisms of Williams' Testimony Contained in the Inspect or General's Report ..................................260
 B. Abouhalima's Legal Claims..........................................261
 1. Interests of Justice ...............................................261
 2. Alleged Newly Discovered Evidence of Perjured Testimony.............261
 a Evidence that Williams Perjured Himself and the Prosecution's Alleged Knowledge Thereof..............................262
 b. Independent Evidence of the Defendants' Guilt ....................262
 II. Abouhalima's Ineffective Assistance of Counsel Claims ..........................263
 A. Trial Counsel's Failure to Argue American Involvement in Abouhalima's Alleged Torture in Egypt ............................................263
 1. Abouhalima's Affidavit ............................................265
 2. The "Salem Tapes" ...............................................266
 a. Salem's Alleged "Double–Agent" Status .........................268
 b. Salem's Alleged Knowledge of Abouhalima's Travels, Arrest and Incarceration in Egypt .........................................269
 c. The FBI's Alleged Knowledge of Abouhalima's Whereabouts an d Effort.............................................273
 B. Trial Counsel's Failure to Move for Suppression of Evidence Seized from Abouhalima's Apartment..............................................275
 1. Issuance of the Search Warrant ....................................275
 2. Lack of Probable Cause ...........................................276
 3. Overbroad Execution .............................................277
 C. Alleged Violations of the Vienna Convention ...........................278
 III. Abouhalima's Newly Discovered Evidence Claims ...........................280
 A. Co–Conspirators' Post–Arrest Statements..............................280
 B. Photographs of Abouhalima Revealing His Alleged Torture.................284
 1. The Airplane Photos ..............................................284
 2. The MCC Photos .................................................285
AJAJ'S MOTION ......................................................285
 I. Alleged Newly Discovered Evidence Regarding Ajaj's Departure to Pakistan...287
 A. Summary of the Evidence at Trial.....................................287
 B. The Alleged Newly Discovered Evidence................................287
 1. Ajaj's Work in University Services..................................287
 2. Ajaj's Conflict with Militant Muslims...............................289
 3. Ajaj's Departure to Pakistan.......................................290
 II. Alleged Newly Discovered Evidence Regarding Ajaj's Activities in Pakistan ......290
 A. Summary of the Evidence at Trial.....................................290
 B. The Alleged Newly Discovered Evidence................................291
 1. Witnesses Regarding Ajaj's Work in University Services ...............291
 2. The Stamps in Ajaj's Passport .....................................292

3. Ajaj's Alleged Innocent Efforts to Return to the United States . . . . . . . . . .293
III. Alleged Newly Discovered Evidence Regarding Ajaj's Return to the United
States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .294
 A. Summary of the Evidence at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .294
 B. The Alleged Newly Discovered Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .294
IV. Alleged Newly Discovered Evidence Regarding The Luggage Ajaj Carried into
the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .295
 A. Summary of the Evidence at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .295
 B. The Alleged Newly Discovered Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .295
 1. Yasin Bazayah's Alleged Ownership of the Incriminating Materials . . . . . .296
 2. The Handwriting on the Bomb Manuals Allegedly Did Not Belong to
Ajaj . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .297
 a. The Argument Lacks Legal Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .297
 b. Defense Counsel Has Knowingly Advanced a Frivolous Claim and
Made False Representations to the Court Pertaining to Trial
Counsel's Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .298
 3. The Government's Evidence With Respect to the Letter of Introduc-
tion to the Terrorist Camp . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .300
V. Alleged Newly Discovered Evidence Regarding Ajaj's Contacts with Ramzi
Yousef . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .301
 A. Summary of the Evidence at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .301
 B. The Alleged Newly Discovered Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .301
VI. Newly Discovered Evidence Regarding The Co–Conspirators' Alleged Lack of
Knowledge of Ajaj . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .302
VII. Miscellaneous Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .302
 A. The Testimony of Mohammad Nabil Elmasry . . . . . . . . . . . . . . . . . . . . . . . . . . .302
 B. Trial Counsel's Alleged Failure to Argue and Request a Jury Charge that
Ajaj Abandoned or Withdrew from the Conspiracy . . . . . . . . . . . . . . . . . . . . .303
 C. Post–Hearing Letters and Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .304
VIII. Comment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .304
CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .305

On February 26, 1993, a bomb exploded in the parking garage beneath the World Trade Center in lower Manhattan killing six, injuring hundreds, and causing millions of dollars in damage. Since that time, two trials have been held before me and six men have been convicted for their roles in the bombing.

The earlier of the two trials took place in 1993 and 1994 and resulted in the convictions of four men—Mahmoud Abouhalima, Ahmad Mohammad Ajaj, Nidal Ayyad and Mohammad Salameh (collectively, "Defendants").[1] On August 4, 1998, the United States Court of Appeals for the Second Circuit affirmed the Defendants' convictions, and on January 19, 1999, defendant Abouhalima's petition for certiorari to the United States Supreme Court was denied. *U.S. v. Salameh,* 152 F.3d 88, 124–26 (2d Cir.1998), *cert. denied,* —— U.S.

——, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999).

Currently before the court are the Defendants' motions pursuant to Rule 33 of the Federal Rules of Criminal Procedure and claims remanded by the Court of Appeals. In these motions and claims, the Defendants seek new trials on grounds of newly discovered evidence and ineffective assistance of counsel.

After a hearing and a careful review of both the record at trial and the voluminous submissions by the Defendants, I am convinced that the Defendants received an extraordinarily fair trial and were convicted on the basis of overwhelming evidence of their guilt. It is clear not only that the Defendants have failed to come forward with any newly discovered evidence to sup-

---

**1.** The latter trial took place in 1997 and resulted in the convictions of two men—Ramzi Yousef and Eyad Ismoil.

port their motions, but also that they have failed to show that they were denied the effective assistance of counsel guaranteed by the Sixth Amendment.

As set forth in full below, the Defendants' motions are denied in their entirety.

## FACTUAL BACKGROUND

On March 4, 1994, after a six month trial, Mahmoud Abouhalima, Ahmad Ajaj, Nidal Ayyad and Mohammad Salameh were found guilty of charges arising from the conspiracy that led to the bombing of the World Trade Center.

The evidence at trial demonstrated that each of them played an important part in ensuring the success of the conspiracy. A brief overview of that evidence is set forth below.

### I. *The Evidence at Trial*

#### A. Ahmad Mohammad Ajaj

The evidence against defendant Ajaj demonstrated that, in April 1992, he left his home in Houston, Texas and traveled to the Middle East where he obtained a letter of introduction to a terrorist training camp. While in the Middle East, Ajaj made contact with Ramzi Yousef, and the two plotted to enter the United States illegally.

On September 1, 1992, Ajaj and Yousef traveled together to John F. Kennedy International Airport in New York ("Kennedy Airport") under assumed names and using falsified passports. In his luggage, Ajaj carried a variety of "terrorist" materials including videotapes advocating terrorist action against the United States, manuals describing how to mount a successful terrorist operation and manuals containing formulas and directions for constructing various explosive devices, including the type of device used in the World Trade Center bombing.

Upon their arrival at Kennedy Airport, Ajaj and Yousef sought to pass through customs separately, and each indicated to Immigration and Naturalization Service ("INS") inspectors that he was traveling alone. Yousef was permitted to enter the country, but Ajaj was not so lucky. INS inspectors recognized that Ajaj's passport was a forgery, and he was detained. Ajaj's luggage was seized, and he was placed under arrest and charged in the Eastern District of New York with passport fraud. He pleaded guilty and was sentenced to six months imprisonment.

Although Ajaj remained incarcerated from the time he and Yousef arrived in the United States until the bombing of the World Trade Center, he continued to play an active role in the conspiracy. He not only kept in contact with Yousef from prison to remain abreast of the conspirators' activities, but when the court in the Eastern District of New York ordered the return of his luggage, he attempted to ensure that the terrorist materials were forwarded to Yousef.

#### B. Mohammad Salameh

Once in the United States, Yousef assembled a group of conspirators. Perhaps the most active of them was defendant Salameh. Together, Salameh and Yousef rented a storage unit and an apartment to manufacture the bomb components.

At the storage unit, Salameh kept chemicals such as urea nitrate and the components of nitroglycerine, as well as explosive materials such as hydrogen tanks intended to enhance the destructive power of the bomb. At the apartment, located at 40 Pamrapo Avenue in Jersey City, New Jersey, the government discovered traces of urea nitrate and nitroglycerine demonstrating that the conspirators used the apartment to mix the chemicals. In essence, the apartment served as a "bomb factory".

With defendant Ayyad, Salameh also rented a Ryder van to transport the bomb

to the World Trade Center.[2] Numerous parts of the van were found at the World Trade Center after the bombing, as were pieces of several of the hydrogen tanks delivered to the storage unit. Although Salameh intended to flee the country after the bombing, he was arrested the day before his planned departure when he returned to the Ryder rental office and sought reimbursement of his $400 rental deposit.

### C. Mahmoud Abouhalima

Defendant Abouhalima played many roles in the conspiracy. In particular, he helped Salameh and Yousef obtain an apartment and build the bomb. In the weeks prior to the bombing, Abouhalima made frequent trips to 40 Pamrapo Avenue and was spotted numerous times moving various items, including large barrels, in and out of the bomb factory. Abouhalima also helped mix chemicals inside the bomb factory, a fact evidenced by chemical burn marks found on his shoes that were consistent with chemicals found in the storage unit.

Abouhalima also further assisted the conspiracy by providing (1) a telephone calling card that the conspirators used to contact each other as well as suppliers of components for the bomb, (2) a refrigerator for the bomb factory that was used to store chemicals such as nitro-glycerine and (3) a sixteen ounce can of smokeless powder—an important ingredient for the type of bomb used by the conspirators.[3]

After the explosion, Abouhalima fled the United States and was eventually captured by Egyptian authorities in Egypt.

**2.** Although unsuccessful, defendant Abouhalima also attempted to obtain a van for the bombing mission.

**3.** At the storage unit, the government recovered a bottle of the same size and brand of smokeless powder and an improvised explosive device made with smokeless powder.

**4.** While there was no requirement for an evidentiary hearing with regard to Defendants' motions, I nevertheless permitted Defendants

### D. Nidal Ayyad

Defendant Ayyad was involved in the conspiracy in a few important ways. In particular, Ayyad used his position as a chemical engineer with Allied Signal Corporation to obtain chemical ingredients for the bomb and hydrogen tanks to enhance its destructive power. With defendant Salameh, Ayyad opened a joint bank account to deposit the funds that financed the bombing plot.

Ayyad was also the spokesman for the conspirators. DNA test results concluded that Ayyad's saliva matched that recovered from a sealed envelope mailed to the New York Times. The letter inside the envelope claimed responsibility for the explosion, and a computer disk retrieval expert testified that she found a draft of the letter in her review of computer disks seized from Ayyad's office. Also, witnesses identified Ayyad's voice as that contained on the recording of a call to the New York Daily News claiming responsibility for the explosion.

### II. *The Rule 33 Motions*

In its decision affirming the Defendants' convictions, the United States Court of Appeals for the Second Circuit remanded the Defendants' post-trial claims to this court for adjudication. *Salameh*, 152 F.3d at 159–61. Accordingly, I held a hearing during the weeks of February 22, 1999 and March 1, 1999 to decide the issues raised ("Hearing").[4]

All four Defendants seek a new trial based on a claim of newly discovered evidence of government misconduct in con-

such a hearing and provided them the opportunity to call witnesses necessary to their claims. Defendants Abouhalima and Ajaj responded by seeking to call over fifty witnesses—nearly all unnecessary to the instant inquiry. As a result, Defendants' repeated requests that I issue subpoenas for the extraneous witnesses were, for the most part, denied. The text of this opinion further clarifies my reasoning with respect to these rulings.

nection with allegedly false scientific testimony offered by the government at trial. In addition, defendants Abouhalima and Ajaj seek a new trial based on separate claims of ineffective assistance of counsel and newly discovered evidence. Defendant Ayyad forwards an independent ineffective assistance of counsel claim.

This opinion constitutes my decision as to all the Defendants' claims.

### DISCUSSION

Rule 33 of the Federal Rules of Criminal Procedure provides that a district court "may grant a new trial to [a] defendant if the interests of justice so require." Fed.R.Crim.P. 33. The law is well settled, however, that Rule 33 motions are "not favored". *See United States v. Spencer*, 4 F.3d 115, 118 (2d Cir.1993). Courts are encouraged to exercise "great caution" and to grant the motion only "in the most extraordinary of circumstances". *Id.* (citations omitted). *See also United States v. Locascio*, 6 F.3d 924, 949 (2d Cir.1993), *cert. denied*, 511 U.S. 1070, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994); *United States v. Costello*, 255 F.2d 876, 879 (2d Cir.1958).

■ In Rule 33 proceedings, the burden falls squarely on the defendant to demonstrate that a new trial is warranted. *See, e.g., United States v. Sasso*, 59 F.3d 341, 350 (2d Cir.1995); *United States v. Moore*, 54 F.3d 92, 99–100 (2d Cir.1995); *Spencer*, 4 F.3d at 119; *United States v. Imran*, 964 F.2d 1313, 1318 (2d Cir.1992). Moreover, the decision of whether to permit discovery and conduct an evidentiary hearing remains within the sound discretion of the trial court. *United States v. White*, 972 F.2d 16, 22 (2d. Cir.), *cert. denied*, 506 U.S. 1026, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992); *United States v. Agunbiade*, No. 90–CR–610(S)–02 (JRB), 1995 WL 351058 (E.D.N.Y. May 10, 1995), *aff'd by, United States v. Osinowo*, 100 F.3d 942, 1996 WL 20514 (2d Cir.1996). If the moving papers themselves disclose the inadequacies of the defendant's case and the opportunity to present live witnesses

would clearly be unavailing, the court may rest its decision solely on the basis of the affidavits and memoranda submitted and need not resort to an evidentiary hearing. *See United States v. Helmsley*, 985 F.2d 1202, 1210 (2d Cir.1993) (quoting *United States v. Slutsky*, 514 F.2d 1222, 1226 (2d Cir.1975)).

■ The only ground for a new trial expressly stated in Rule 33 is "newly discovered evidence". Fed.R.Crim.P. 33. To obtain a new trial based on newly discovered evidence, a defendant must show that the evidence (1) was discovered after trial, (2) could not have been discovered before or during trial through the exercise of due diligence, (3) is material, non-cumulative and not merely impeaching, and (4) if admitted, "would probably lead to an acquittal." *Locascio*, 6 F.3d at 949 (quoting *United States v. Gilbert*, 668 F.2d 94, 96 (2d Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982)). *See also Spencer*, 4 F.3d at 119 (citations omitted); *United States v. Cruz*, 602 F.Supp. 825, 828–29 (S.D.N.Y.1985).

■ While not expressly stated in the rule, a defendant may also seek a new trial pursuant to Rule 33 based on a claim of ineffective assistance of counsel. *See United States v. Muyet*, 994 F.Supp. 550, 558–62 (S.D.N.Y.1998). The inquiry into whether a criminal defendant's legal representation was so deficient that it violated the Sixth Amendment to the United States Constitution is also well-settled. U.S. Const. amend VI. A defendant must (1) show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," and (2) "affirmatively prove prejudice" by demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–94, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■ With respect to the first inquiry, judicial scrutiny of counsel's performance must be "highly deferential". *Id.* at 689, 104 S.Ct. 2052. A defendant must overcome strong presumptions regarding his attorney's performance. *Id.* at 690, 104 S.Ct. 2052. In order to challenge strategic decisions made by counsel, a defendant faces a difficult burden:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

*Id.* at 690–91, 104 S.Ct. 2052.

The court should consider the defendant's communications with counsel:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. **For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.**

*Id.* at 691, 104 S.Ct. 2052 (emphasis added).

With respect to the second inquiry, the prejudice inquiry, "a court hearing an inef-

fectiveness claim must consider the totality of the evidence" and determine whether, after finding attorney error, the error "had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture ... [or] had an isolated, trivial effect." *Id.* at 695–96, 104 S.Ct. 2052. Here, the court is concerned with whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696, 104 S.Ct. 2052. *See also Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."); *Lockhart v. Fretwell,* 506 U.S. 364, 369–70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (focus is not only on outcome of the trial, but also on whether proceeding was fundamentally unfair or unreliable).

## AYYAD'S CLAIMS

In its opinion affirming the Defendants' convictions, the Second Circuit remanded Nidal Ayyad's claims of ineffective assistance of counsel for my consideration. *Salameh,* 152 F.3d at 161. Because Ayyad's claims were not the subject of a post-trial Rule 33 motion, and he advances no independent claims of newly discovered evidence, his claims can be considered solely on the basis of the record.[5]

At trial, Ayyad was represented by Atiq Ahmed, Esq., a member of both the Maryland and Virginia bars admitted *pro hac vice* to this court. On appeal, he was initially represented by Jeremy Schneider, Esq., but a conflict of interest arose when Ayyad filed a grievance against Mr. Schneider with the disciplinary committee

---

5. It is clear that if Ayyad's claims were considered under Fed.R.Crim.P. 33, he would be unable to prove that the interests of justice would require the court to grant him a new trial. *See generally* Appendix A, filed herewith under seal.

of the Appellate Division. Accordingly, Mr. Schneider was relieved as Ayyad's counsel on February 22, 1999. Hearing Tr. at 6. He was replaced by Francisco Celedonio, Esq.

In support of his present claim for relief, Ayyad raises several claims of ineffective assistance of counsel.[6]

### I. Trial Counsel's Lack of Federal Criminal Practice Experience

Ayyad alleges that he received ineffective assistance of counsel because Attorney Ahmed lacked experience practicing criminal law in federal court, particularly in the Southern District of New York. He offers no support for this proposition, however, and provided no evidence to bolster this claim.

██ In any event, there is no basis for the assertion that an attorney's assistance is ineffective merely because he has no prior experience in a particular district or in a particular area of law. The argument would have one conclude that every "first" trial is perpetrated by an incompetent, a position this court is unwilling to accept. The test is whether Attorney Ahmed provided objectively reasonable counsel such that the verdict against Ayyad can be viewed as reliable. See Strickland, 466 U.S. at 687–88, 694, 104 S.Ct. 2052; Lockhart, 506 U.S. at 369–70, 113 S.Ct. 838. There is no basis whatsoever that Attorney Ahmed's lack of experience with criminal cases in the Southern District of New

York in any way affected his ability to provide objectively reasonable counsel in this case.

### II. Trial Counsel's Failure to Consult or Retain Various Expert Witnesses

Ayyad also argues that Attorney Ahmed provided ineffective assistance of counsel in failing to consult or retain experts to analyze numerous scientific reports generated by the government's expert witnesses.

On January 28, 1994, during the fourth month of trial, Attorney Ahmed did seek funds for the retainer of a DNA analyst, a linguistics expert, an explosives expert, a computer expert and a sociologist. The court allowed Ayyad $35,000 in Criminal Justice Act ("CJA") funds for such purposes. See 18 U.S.C. § 3006A(e)(1) (1985 & Supp.1999) ("Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application."). Attorney Ahmed did not seek a continuance or eventually call any such witnesses, however.

Ayyad argues that these experts would have provided the following testimony helpful to his defense: (1) the DNA expert would have challenged the FBI's conclusion that DNA matching Ayyad's was found in the saliva on the envelope sent to the New York Times and would have highlighted the fact that Ayyad's saliva was not found on the stamp to the envelope; (2)

---

**6.** These claims were all raised by Mr. Schneider—before Mr. Celedonio became involved—on behalf of Ayyad. Further analysis as to the merit of these claims, including Mr. Schneider's counsel in this regard, can be found in Appendix A, filed herewith under seal.

By letter dated June 14, 1999, Mr. Celedonio sought leave of the court to submit a brief on behalf of Ayyad raising—presumably— claims other than those already submitted by Mr. Schneider to the Second Circuit Court of Appeals and remanded to this court for adjudication. Salameh, 152 F.3d at 161 ("we decline to exercise our discretion to hear Ayyad's [ineffective-assistance of counsel]

claims on direct review"). Mr. Celedonio made his request in the wake of my denial of his application to seal Ayyad's Hearing from the public. See Appendix A, note 1, filed herewith under seal.

New ineffective assistance of counsel claims cannot be raised at this juncture, however. Any such claims would have to be considered under Rule 33, and the time for filing such claims has long since expired. See Fed. R.Crim.P. 33 ("A motion for a new trial based on any other grounds [than newly discovered evidence] may be made only within 7 days after the verdict or finding of guilty or within such further time as the court may fix during the 7–day period.").

the linguistics expert would have testified that Ayyad did not write the letter sent to the New York Times because its linguistic style went well beyond Ayyad's literary acumen; (3) the explosives expert would have challenged the government's forensic evidence and bolstered Ayyad's theory that a bomb did not cause the World Trade Center explosion; (4) the computer expert would have testified about the unreliability of retrieving erased material from a computer disk and the fact that information can be easily placed on a disk absent the owner's knowledge; and (5) the sociologist would have testified that in the Arab community, immigrants frequently do favors for each other without asking questions and that therefore, Ayyad's mere "favors" for his co-conspirators could not have been viewed as evidence of his intent to commit the terrorist acts.

He further argues that a voice analysis expert would have challenged the government's voice identification testimony confirming that Ayyad's voice was the same as that tape recorded on the call to the New York Daily News claiming responsibility for the bombing.

■ As detailed below, the arguments raised by Ayyad on this point are absolutely of no avail to him. Argument (1) above suggests, in part, that although Ayyad was likely to have sealed the envelope containing the letter claiming responsibility for the bombing, he did not put a stamp on the envelope. There is an obvious explanation with respect to the stamp, however; it was self-adhesive. In light of the strength of the government's evidence and the facts at trial, Attorney Ahmed's decision not to seek the testimony of a DNA expert on this matter was entirely within the range of reasonable competent assistance [7] and not a basis for a finding of prejudice. *See also* Appendix A, filed herewith under seal.

■ Argument (2) also lacks merit. It suggests that Attorney Ahmed's failure to seek testimony from a linguistics expert about Ajaj's writing skills should cause this court to question its confidence in Ayyad's verdict. The proposed testimony, however, is both immaterial and speculative and would not have been admitted into evidence. As such, Argument (2) provides no basis for a finding of ineffective assistance of counsel. *See also* Appendix A, filed herewith under seal.

■ Argument (3) meets a similar fate. As it turned out, the explosives expert hired by the defense herein actually testified in the second World Trade Center bombing trial—the trial of Ramzi Yousef and Eyad Ismoil—and concluded that the damage to the World Trade Center was caused by a bomb. Ramzi Yousef, the mastermind behind the bombing, also subsequently admitted in his post-arrest statement to the bomb's manufacture by the conspirators. There is simply no basis for Ayyad's argument that he suffered ineffective assistance of counsel in failing to call an explosives expert. *See also,* Appendix A, filed herewith under seal.

■ Argument (4) lacks merit because in substantial part, it suggests, that Attorney Ahmed should have hired an expert to testify that information can be placed on a computer disk absent the owner's knowledge. Attorney Ahmed, however, was free to obtain the admission of this information from the government's own expert. Whether he would have been able to do so, the failure to elicit this evidence before the jury does not cause me to question my confidence in the verdict against Ayyad. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

Additionally, Ayyad's argument that a computer expert would have provided tes-

---

**7.** Moreover, as the government points out in its brief on appeal, Attorney Ahmed's cross-examination of the government's DNA expert was actually quite effective. Govt's Brief on Appeal at 354–55. He therefore might have made a strategic decision that Ayyad's own DNA expert would not have provided any additional helpful testimony. I have been presented with no evidence to support a finding that such a decision was anything less than reasonable.

timony about the unreliability of retrieving erased material from a computer disk does not warrant a finding of either attorney error or that the failure to hire this expert was prejudicial to Ayyad. The jury was entitled to evaluate the credibility of the government's computer expert on this issue and free to make this determination themselves. *See also* Appendix A, filed herewith under seal.

■ Argument (5) suggests that this court would have permitted testimony from a sociologist that as a member of the Arab community, Ayyad's inculpatory activities were mere favors for his friends. Whether I would have admitted this questionably relevant and speculative testimony, the argument underlying this claim— Ayyad's supposed innocent favors for his friends—was actually raised by Attorney Ahmed in his summation. *See generally* Trial Tr. at 8633–8725. As such, there is no basis to find ineffective assistance of counsel on this issue. *See also* Appendix A, filed herewith under seal.

■ Lastly, Ayyad's suggestion that a voice analysis expert should have been called by Attorney Ahmed ignores the fact that witnesses who were knowledgeable about Ayyad's voice identified it as his on the call to the New York Daily News. *See* Fed.R.Evid. 701 (opinion testimony by lay witnesses). Attorney Ahmed may have been aware of the fact that an expert witness would only have confirmed the lay witnesses' testimony. He may well have known at the time that it was Ayyad's voice on telephone. *See generally* Appendix A, filed herewith under seal.

In short, I find that Attorney Ahmed's failure to seek the testimony of any of these witnesses was a decision well within "the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. *See also United States ex rel. Walker v. Henderson,* 492

F.2d 1311, 1314 (2d Cir.), *cert. denied,* 417 U.S. 972, 94 S.Ct. 3179, 41 L.Ed.2d 1144 (1974) ("[T]he decision to call or bypass particular witnesses is peculiarly a question of trial strategy, . . . which courts will practically never second-guess."). Instead of seeking the testimony of these witnesses, the record at trial reflects that Attorney Ahmed sought to cross-examine the damaging government testimony and utilize information obtained through cross-examination to make his summation on behalf of Ayyad.

"[C]ounsel's function . . . is to make the adversarial testing process work in the particular case." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Ayyad has made no showing that Attorney Ahmed failed to do so here. Attorney Ahmed's failure to consult or retain the expert witnesses certainly does not call into question my confidence in the reliability of the verdict against Ayyad. *Id.* at 694, 104 S.Ct. 2052.

### III. *Trial Counsel's Alleged Ineffective Motion Practice and Preparation for Defense Case*

Ayyad also argues that Attorney Ahmed's pre-trial motions were legally and factually deficient and left the court without a clear understanding of the relief sought.

Attorney Ahmed made motions on behalf of Ayyad for the following: (1) inspection of the grand jury minutes; (2) dismissal of the indictment; (3) disclosure and exclusion of evidence of "other acts"; (4) general pre-trial discovery; (5) change of venue; (6) disclosure of a list of jurors and potential witnesses; (7) disclosure of inducements, threats, promises, or payments to government witnesses; (8) a bill of particulars; (9) severance of Ayyad's trial; (10) suppression of identification; (11) suppression of a statement made by Ayyad;[8] and (12) suppression of items

---

**8.** When agents came into his home, Ayyad stated "I'll talk, it gets complicated". Testimony at trial established that the agents elicit-

ed this statement only after advising Ayyad of his constitutional rights. Trial Tr. at 6042–43.

seized from Ayyad's home.[9] For various reasons, these motions were all denied.

■ Ayyad has failed to show that Attorney Ahmed's motion practice violated his Sixth Amendment right to effective assistance of counsel. While his motions may have been denied, their denial alone provides insufficient evidence to find that they were filed in error or otherwise outside the range of competent professional assistance. Overall, they reflected the efforts of reasonable, diligent counsel. *See, e.g., United States v. Nersesian*, 824 F.2d 1294, 1321–22 (2d Cir.1987) (rejecting claim that counsel was ineffective because motion practice not "adequate" or "zealously pursued" or that a motion failed to raise a certain argument).

In any event, to the extent any of the individual motions left Ayyad's request for relief unclear or to the extent Attorney Ahmed failed to make any additional motions, Ayyad has not demonstrated that any prejudice resulted. He has not shown that "but for" Attorney Ahmed's unprofessional errors in his motion practice, "there is a reasonable probability that the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. 2052. *See also Nersesian*, 824 F.2d at 1322 ("not every possible motion need be filed … only those having a solid foundation"); *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir.1995) ("the failure to make a meritless argument does not rise to the level of ineffective assistance"). If anything, Attorney Ahmed's diligent efforts to seek relief through the numerous pre-trial motions listed above reflected a zealous and vigorous challenge to the government's proof against Ayyad.

## IV. *Trial Counsel's Alleged Ineffective Trial Conduct*

Ayyad also attacks Attorney Ahmed's performance at trial, a trial in which Attorney Ahmed faced overwhelming evidence of Ayyad's guilt.

### A. The In–Court Identification

Ayyad argues that he received ineffective assistance of counsel because after a Ryder employee testified that he rented a van to Salameh and another person, Attorney Ahmed asked the employee, who had not previously identified Ayyad, if he would recognize that other person if he saw him. The employee then identified Ayyad as the man who rented the van with Salameh.

■ Although in hindsight, the identification in response to Attorney Ahmed's question was damaging to Ayyad's defense, the question displayed an objectively reasonable trial strategy. Up until trial, the Ryder employee was unable to identify the other man that rented the van with Salameh. Through his question, Attorney Ahmed thus chose to take a tactical risk—a risk that the employee's continued failure to identify Ayyad in front of the jury would benefit Ayyad's defense. Because Attorney Ahmed had a legitimate basis for the inquiry, his cross-examination must be found objectively reasonable. The fact that the witness responded unexpectedly does not give validity to Ayyad's claim of ineffective assistance of counsel. *See also* Appendix A, filed herewith under seal.

### B. Cross–Examination

Ayyad argues that his trial counsel's cross-examination was "senseless and peculiar" and "either bolstered the government's case or presented contradictory defense theories". Ayyad App. Brief at 39.[10]

---

9. Attorney Ahmed did not make a motion for suppression of the computer disk found in Ayyad's office that contained a draft of the letter sent to the New York Times. Even if such a motion had been made, because Ayyad had no expectation of privacy in the property of his employer, it would have been denied.

*See, e.g., Verri v. Nanna*, 972 F.Supp. 773, 797 (S.D.N.Y.1997).

10. In making this argument, Ayyad fails to recognize that the role of his attorney was not to prove him innocent, but to create a reasonable doubt in the minds of jurors—a goal that

First, Ayyad complains that despite overwhelming forensic evidence that a bomb caused the damage in the World Trade Center, Attorney Ahmed asked questions of witnesses intended to imply that the explosion may have resulted from material in a dental office in the building, a transformer malfunction, a gas tank from a non-existent tenant or residual gas from the cars in the parking garage. He further attempted to elicit testimony that the damage to the World Trade Center may have been caused by a fire that occurred in the building during its construction in 1970.

Ayyad argues that had his counsel conducted an appropriate pre-trial investigation, he would have realized the futility of these lines of examination.[11]

■ Futile or not, Attorney Ahmed seems to have made a strategic decision that he would concede little evidence in Ayyad's defense—even the government's proof of the cause of the damage to the World Trade Center. While Ayyad's challenge implies that he thinks he would have received more effective counsel had Attorney Ahmed conceded the government's proof of cause, Attorney Ahmed's attempt to raise doubt as to this issue cannot be viewed as "outside the wide range of professionally competent assistance" or an error resulting in prejudice. *Strickland*, 466 U.S. at 690, 694, 104 S.Ct. 2052.

■ Ayyad also argues that Attorney Ahmed's cross-examination confirmed, rather than undercut, testimony that the government elicited on direct examination. None of Ayyad's arguments, however, support a finding of ineffective assistance of counsel. "Decisions whether to engage in

cross-examination, and if so to what extent and in what manner, are ... strategic in nature." *Nersesian*, 824 F.2d at 1321. In a trial in which there was overwhelming evidence of Ayyad's guilt, Attorney Ahmed's chosen lines of cross-examination were bound to occasionally fail to elicit the testimony expected. This does not mean that such failures were errors outside the range of reasonable and competent assistance or that they affected the reliability of the verdict against Ayyad.

## C. Summation

Ayyad also challenges Attorney Ahmed's summation as a basis for his claim of ineffective assistance of counsel. He asserts that Attorney Ahmed committed error when he reminded the jury about the fact that it was him, and not the government, that elicited the in-court identification. Trial Tr. at 8637–38, 8715–16. He alleges that it was illogical for Attorney Ahmed to accuse the government of failing to ask certain questions or call certain witnesses when he could have done so himself. *Id.* at 8691, 8696–97.

He further argues that Attorney Ahmed committed prejudicial error in his summation when he discussed theories or testimony that had no basis in the evidence. For example, Attorney Ahmed argued that Ayyad was "framed" by the government in an effort to cover up their failure to prosecute Abdul Rahman Yasin, a fugitive co-conspirator. *Id.* at 8634–35. He argued that Ayyad purchased chemicals for export to the Middle East as a legitimate business matter and that Ayyad and Salameh, old family friends, opened a joint back account innocently for a new business. *Id.* at

can be accomplished by advancing inconsistent theories of defense. *See, e.g., Brown v. Rice,* 693 F.Supp. 381, 398 (W.D.N.C.1988) ("There is nothing particularly unusual or unconstitutional about going to the jury on two different theories of defense, particularly where a man's life is at stake."), *aff'd in relevant part,* 891 F.2d 490 (4th Cir.1989), *cert. denied,* 495 U.S. 953, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990).

11. It is of note that Ayyad argued above that trial counsel should have hired a forensic explosives expert to prove that no bomb was involved in the destruction to the World Trade Center. *See supra* Part II. Here, he argues the futility of such a strategy.

8652–53, 8668, 8681. He also argued that Ayyad was out of the country getting married and on his honeymoon during much of the conspiracy and stated that Ayyad could not have made certain incriminating phone calls because "witness after witness came in and said Ayyad was abroad".[12] *Id.* at 8673, 8682–83.

■ In evaluating an ineffective assistance of counsel claim based on an attorney's summation, a court is required to assess the effectiveness of the summation as a whole. *See United States v. Hon* 17 F.3d 21, 27 (2d Cir.1994). The alleged incompetent errors detailed above did not constitute Attorney Ahmed's entire closing argument. That argument lasted over four hours.

■ In his summation, Attorney Ahmed pointed out the absence of any forensic evidence tying Ayyad to the locations associated with the manufacture of the bomb. Trial Tr. at 8666, 8672, 8684. He argued that Ayyad did not understand the purpose for his purchase of the chemicals and had neither the knowledge nor the intent required to be found guilty. *Id.* at 8661–69, 8691–93, 8724–25. He noted that every time that Ayyad made telephone calls for chemicals, he never attempted to hide his identity. *Id.* at 8666, 8691.

Attorney Ahmed also noted shortcomings in the evidence that Ayyad claimed responsibility for the bombing. Namely, he argued to the jury that there was no evidence that the call to the New York Daily News was placed from Ayyad's home. *Id.* at 8711. Also, he noted that the government produced lay witnesses to identify Ayyad's voice on the telephone call as opposed to a voice identification expert. As Attorney Ahmed argued, the lay witnesses did not include Ayyad's secretary, the person with whom he spoke the most at work. *Id.* at 8696–97. Attorney Ahmed also pointed out discrepancies between the actual letter sent to the New York Times and the draft of the letter found on the computer disk seized from Ayyad's office. He noted the government's failure to test the disk seized in Ayyad's office for fingerprints. *Id.* at 8698–8705, 8717–19.

As such, I find that while Attorney Ahmed's summation might have failed to persuade the jury to acquit Ayyad, it was not on the whole ineffective. Attorney Ahmed's summation was, after all, part of the overall argument which kept the jury in this case deliberating for six days, even in the face of overwhelming proof of guilt.

## ABOUHALIMA'S MOTION[13]

### I. Allegations of Newly Discovered Evidence of False Trial Testimony by Special Agent David Williams

All four Defendants have joined in Abouhalima's claim that a new trial is warranted because of the allegedly "invalid and misleading" trial testimony of FBI Supervisory Special Agent David Williams.

Williams, an examiner in the FBI Laboratory, headed the scientific investigation into the World Trade Center bombing and testified as an explosives expert for the government at trial. Williams testified as a "summary witness"—that is, as an explosives expert who based his testimony in part on the trial record that preceded his testimony.[14] During his testimony, which

12. There was no such parade of witnesses.

13. At the outset, I must note that Abouhalima, like Ayyad, is unable to prove that "the interests of justice" require that he be granted a new trial. *See* Appendix B, filed herewith under seal. This fact alone mandates that Abouhalima's motion be denied in its entirety because all his claims were brought pursuant to Fed.R.Crim.P. 33. Nevertheless, for the sake of completeness, I provide the discussion

that follows which details the myriad other flaws in Abouhalima's claims.

14. The government explicitly stated on the record at trial that Williams would "base his testimony on a lot of other testimony" and requested permission to show Williams the trial transcripts. Trial Tr. at 3986. There was no objection to this request, and thus, it was granted. *Id.* In addition, Williams referred to his review of the trial transcript

lasted nearly three days, Williams discussed a host of issues concerning the FBI Laboratory's investigation into the bombing.

Following the trial, aspects of Williams' testimony came under criticism when the Office of the Inspector General for the Department of Justice ("IG") issued a report reviewing practices in the FBI Laboratory. *See The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosives–Related and Other Cases,* United States Department of Justice, Office of the Inspector General, 93–146 (April 1997) ("IG Report"). The IG Report was instigated by allegations of improprieties at the FBI Laboratory lodged by Dr. Frederic Whitehurst. Like Williams, Whitehurst was a Supervisory Special Agent and examiner at the FBI Laboratory who assisted in the FBI's investigation into several high-profile cases, including the World Trade Center bombing. From the time he joined the FBI Laboratory in 1986, Whitehurst lodged hundreds of complaints concerning its operation.[15]

With regard to the World Trade Center case, the IG investigated numerous allegations of wrongdoing claimed by Whitehurst. The IG concluded that the vast majority of the allegations were "merit-less" or "that any error was insignificant". IG Report at 83. As to three areas of Williams' testimony, however, the IG concluded that Williams gave "inaccurate and incomplete" testimony or provided "invalid opinions that appeared tailored to the most incriminating result." *Id.* The three areas of testimony supported the government's theory that urea nitrate served as the main charge of the bomb constructed by the conspirators and detonated under the World Trade Center.[16]

Abouhalima claims that the revelation of the flaws in Williams' testimony constitutes newly discovered evidence that mandates a new trial. In support of this claim, Abouhalima called Whitehurst to testify at the Hearing and offered the IG Report into evidence. Whitehurst testified about his criticisms of Williams' testimony that were subsequently adopted by the IG. Whitehurst also testified concerning his allegations that were found to be without merit by the IG, including many allegations having nothing to do with Williams' testimony.

In order to assess Abouhalima's claims, a brief overview of Whitehurst's testimony, as well the findings of the IG Report, is necessary.[17]

---

during his direct testimony, and defense counsel referred to Williams' review of the transcript during their cross-examination. *Id.* at 7915–18, 8009–63, 8151–56. *See also* Hearing Tr. at 231.

15. Some of Whitehurst's complaints were disclosed to defense counsel during trial. Whitehurst was also produced by the government and was subject to a full day deposition by counsel for all the defendants, who then chose not to call him at trial.

16. None of the inaccuracies cited by the IG challenged the conclusion that a bomb caused the explosion under the World Trade Center.

17. A complete picture of Whitehurst's allegations and the IG Report's findings is contained in the IG Report. *See* IG Report at 83–145. For purposes of this Opinion only, I will accept the IG's findings regarding Williams' testimony and the World Trade Center bomb-ing investigation. It must be noted, however, that valid criticisms regarding the findings in the IG Report—including the finding of flaws in Williams' testimony—have been raised. *See* Response/Reply Appendix to IG Report §§ 1, 7.

In addition, while virtually all of the allegations of misconduct elicited from Whitehurst at the Hearing are summarized herein, the sole legal claim that Abouhalima has advanced concerning such misconduct is newly discovered evidence of false testimony by Williams. Thus, the substantive legal analysis in this section of the Opinion addresses only this claim. However, other meritless arguments that Abouhalima's appellate attorney, Lawrence Mark Stern, sought to raise at the Hearing concerning the allegations lodged by Whitehurst are also specifically addressed in this section.

### A. Overview of Dr. Frederic Whitehurst's Hearing Testimony and the Inspector General's Report

#### 1. Whitehurst's Background and Initial Involvement in the World Trade Center Investigation

Whitehurst's area of expertise was "explosive residue analysis." Hearing Tr. at 163–64. Whitehurst described this field at the Hearing:

> I did residue analysis. When a bomb goes off, it leaves chemicals that are or can be construed to be a fingerprint of what the explosive was before it went off.

*Id.* at 164.

Whitehurst's involvement in the World Trade Center bombing investigation began on the day of the bombing. Hours after the attack, the FBI sent Whitehurst to New York to evaluate the "explosive residue problem" at the crime scene. *Id.* at 165. Before he left for New York that night, Whitehurst was informed that David Williams was in charge of the FBI's forensic investigation into the bombing. *Id.* at 168.

In the days following the bombing, Whitehurst worked at the crime scene in New York City and at a laboratory nearby "trying to understand through the residue examination what type of explosive chemical energetic material was actually involved in the bomb." *Id.* at 173–74.

On approximately the tenth day after the bombing, the laboratory that Whitehurst was using was forced to shut down after Whitehurst accidentally contaminated the lab with nitroglycerine. *Id.* at 174–75. Whitehurst returned to the FBI Laboratory and continued analyzing debris materials. *Id.* at 190.

#### 2. Whitehurst's Concerns Regarding the Urea Nitrate Theory

According to Whitehurst, after a substantial amount of urea nitrate was found at the conspirators' "bomb factory", many in the FBI theorized that the World Trade Center explosion was caused by a bomb with a main charge of urea nitrate ("Urea Nitrate Theory"). *Id.* at 181–85, 190. Thus, it was left to the FBI Laboratory to determine whether scientific evidence supported this theory.

The normal way that a crime laboratory determines the main charge of an exploded bomb is by residue analysis, that is, by finding unconsumed particles or distinctive by-products of the explosive among the residue. IG Report at 96. As Whitehurst stated at the hearing:

> if we could place [urea nitrate] at the World Trade Center, it would essentially . . . be the nail that locked the top of the coffin on, if you will. If we found urea nitrate residue in the World Trade Center, and we found it at a manufacturing facility, we all realized the implications of that . . .

*Id.* at 180, 183–85.

Whitehurst believed, however, that it was impossible to conclude from residue analysis that urea nitrate was the main charge of the World Trade Center bomb. *Id.* at 177–78. The problem was that the FBI Laboratory had no experience with urea nitrate. *Id.* at 178. Thus, it had no technique for confirming the presence of urea nitrate in trace amounts on debris from the bombing. *Id.* at 180, 216, 229.

The FBI Laboratory did, however, have the capability to detect the presence of trace amount of urea and nitric acid—the substances into which urea nitrate quickly decomposes when exposed to moisture or humid air. *Id.* at 180–81.

If urea nitrate were used in the bombing, it would likely have decomposed into urea and nitric acid shortly after the blast, leaving traces of the two substances on the debris. Thus, if urea and nitric acid were found on the debris, it could constitute "distinctive by-products" of a urea nitrate main charge.

In fact, both urea and nitric acid were found on debris. *Id.* at 181. Whitehurst believed, however, that because of contam-

ination, urea and nitric acid would likely have been present at the crime scene even if the explosive used were not urea nitrate. *Id.* at 180–81.[18] Thus, Whitehurst concluded that it was impossible to determine unequivocally through residue analysis that the main charge was urea nitrate. *Id.* at 178.

### 3. Whitehurst's Disagreements with His Superiors

According to Whitehurst, his refusal to adopt the Urea Nitrate Theory, as well as his concerns about other aspects of the investigation, resulted in several disagreements with his superiors at the FBI Laboratory prior to the first World Trade Center trial. Recounted below is a brief overview of Whitehurst's disagreements, and I note that all Whitehurst's complaints were resolved to his satisfaction prior to trial. *See* IG Report at 83.

#### a. The April Report

On April 12, 1993, the FBI Laboratory issued an official report concerning the evidence collected in the World Trade Center investigation ("April Report"). *Id.* at 194–95; IG Report at 140–41. The April Report included findings from explosive residue analysis conducted on debris from the crime scene. IG Report at 140.

The analyses were conducted at the FBI Laboratory, but not by Whitehurst. *Id.*

The April Report included at least one finding that the presence of urea nitrate had been detected on a piece of debris recovered from the crime scene. *Id.* Whitehurst disagreed strongly with this conclusion because it was based on:

reports that were written by people who were not [as] qualified in my opinion as the position I was in to render them. The data wasn't sufficient to render the opinions.

*Id.* at 194. Specifically, Whitehurst argued that the analyses were only showing the presence of urea and nitric acid—not urea nitrate. IG Report at 140. Whitehurst's concerns were overruled, and the April Report was issued. *Id.*

After an incident where Whitehurst and another examiner demonstrated the flaw in the April Report's findings, Whitehurst was given permission to review the Report and prepare new "dictations" where his findings differed from those contained in the Report.[19] *Id.;* Hearing Tr. at 196.

#### b. The Attempt to Alter Whitehurst's Dictation

Whitehurst prepared at least two new dictations with regard to two particular

---

18. Whitehurst claimed that there were a host of alternate reasons that could explain the presence of urea and nitric acid (nitrate) at the crime scene:

For instance, nitrate is an issue because we are in an acid rain belt here and that [the crime scene] was a garage. Nitrate ions are not uncommon under those circumstances.

In fact, we had gone to another building in the area and found a lot of nitrate—we found a lot of ammonium also. Urea is something that comes—it's produced by your body. It's in urine. At the time it was being used on the streets of New York to melt ice, or so I was advised. It's a biologically friendly material, I guess is what they call it. And I was told two four-foot diameter sewage mains had broken, had burst, and sprayed sewage into the scene. Therefore, finding urea and finding nitrate ions would not be necessarily only consistent with ... a urea nitrate based bomb.

*Id.* at 178–79.

19. The "incident" involved a "blind test" that Whitehurst and another examiner in the FBI Laboratory, Steven Burmeister, carried out on Roger Martz, one of the chemists who conducted the analyses to which Whitehurst objected. The "incident" was described in the IG Report:

Whitehurst and Burmeister then prepared a "blind test" for Martz by submitting to him specimens they claimed were from the Trade Center evidence. In reality, Whitehurst and Burmeister prepared one sample from Whitehurst's urine and another by mixing ammonium nitrate fertilizer and urea. According to Burmeister, "the results were close enough that you wouldn't be able to tell the difference from running a sample of urea nitrate." (Martz insists he never rendered an opinion that these samples were urea nitrate, but said only that his instrument detected urea and nitric acid.) IG Report at 140.

debris samples. IG Report at 134. The dictations indicated that only urea and nitric acid—not urea nitrate—had been detected on the samples. *Id.* The dictations also stated that alternate reasons existed that could account for the presence of urea and nitric acid on the samples, and thus, no conclusion regarding the presence of urea nitrate could be reached. *Id.*

After submitting the dictations, Whitehurst was called into speak with his Unit Chief at the FBI Laboratory:

> Roughly I remember that the [dictations] said something to the effect that the explosive could have been urea nitrate explosive. However, there were other materials that we found such as ... the urea on the road, or the urea from the sewage, nitrate ions from, you know, whatever. And we could not discount those as where the material came from. And my boss called me in. He showed me a piece of paper that I had written and highlighted on that piece of paper were the alternative explanations for the data and he said, they want you to take that out.

Hearing Tr. at 190–91 (emphasis added). Apparently the "they" who wanted the alternate reasons deleted from the dictations was David Williams. *Id.* at 191; IG Report at 135.

A meeting was held among several supervisors at the FBI Laboratory to discuss Whitehurst's dictations, and it was agreed that the dictations would be left substantially unchanged. Hearing Tr. at 252–53; IG Report at 135. Williams agreed to this decision. Hearing Tr. at 202–05, 341; IG Report at 135.

#### c. The July Report

Whitehurst's dictations were then incorporated into a revised official report issued by the FBI Laboratory on July 1, 1993 ("July Report"). Hearing Tr. at 202–05, 341; IG Report at 141.

The revised report remedied Whitehurst's objections to the April Report and, according to Whitehurst, provided an accurate assessment of the scientific evidence in the World Trade Center bombing. Hearing at 203–04. Moreover, the IG found that this controversy was "correctly resolved", and that there was "no misconduct".[20] *See* IG Report at 140–43.

#### 4. The Haldimann Episode

On December 15, 1993, while the first World Trade Center trial was ongoing, Whitehurst attended a Christmas party at FBI Headquarters. Hearing Tr. at 217. At the party, Whitehurst engaged in a conversation with Supervisory Special Agent Don Haldimann from the FBI's New York office. *Id.*

In his testimony at the Hearing, Whitehurst claimed that:

> Mr. Haldimann was concerned about the complexity of my reports and the format that they were in and that they could cause damage to the prosecutors' case and the World Trade Center case. And he advised me at the time that the prosecutors had ... asked him if there was any way to get around my testimony ...

*Id.* at 219–20. Shortly after his conversation with Haldimann, on December 19, 1993, Whitehurst sent a memorandum to the IG summarizing the conversation. Hearing Tr. at 220; IG Report at 144. Whitehurst also stated in the memorandum that he believed the conversations indicated possible suppression of evidence and unethical behavior by prosecutors at the United States Attorney's Office.[21] Hearing Tr. at 220; IG Report at 144.

---

**20.** At the Hearing, Mr. Stern also sought to elicit testimony from Whitehurst concerning an incident where Williams argued with Whitehurst over his findings concerning the presence of nitroglycerine on a particular specimen. IG Report at 143. The IG found no impropriety with regard to this incident. *Id.* Mr. Stern also sought to elicit testimony concerning an incident where Williams changed the format of report prepared by Whitehurst, only to reverse the change when Whitehurst objected. *Id.* The IG found this incident to be "innocuous". *Id.*

**21.** This memorandum was the first of two hundred thirty-seven letters that Whitehurst sent to the IG concerning his claims of mis-

Whitehurst's claims regarding his conversation with Haldimann were investigated by the IG, and the IG found that Whitehurst "grossly overstated the matter", and that there was no evidence of suppression of evidence or other unethical behavior by prosecutors.[22] IG Report at 145.

## 5. Criticisms of Williams' Testimony

On January 8, 1996, nearly two years after the conclusion of the first World Trade Center trial, Whitehurst sent an eighty page letter to the IG critiquing Williams' testimony at trial. Hearing Tr. at 269. The letter marked the first occasion that Whitehurst notified anyone in the Department of Justice or the FBI about his concerns regarding Williams' testimony. *Id.*

In connection with the preparation of the IG Report, the IG investigated Whitehurst's criticisms. In the end, the IG found that the vast majority of the allegations were "meritless" or resulted in errors that were "insignificant". IG Report at 83. The IG did find, however, that Whitehurst's allegations with regard to three areas of Williams' testimony were legitimate. Thus, as detailed below, the IG criticized Williams for providing what it found to be "inaccurate and incomplete testimony", as well as "testimony tailored to the most incriminating result." [23] *Id.*

### a. Criticisms of Williams' Testimony Contained in the Inspector General's Report

The first area of Williams' testimony criticized by the IG concerned the FBI's efforts after the bombing to manufacture urea nitrate and construct a urea nitrate based bomb. *See* IG Report at 84–95. The IG found that Williams falsely represented that the FBI manufactured urea nitrate based on formulas found in the manuals contained in the terrorist kit seized from Ajaj when he was arrested at Kennedy Airport. The IG also found that Williams overstated his involvement in the manufacturing process.

The second area of Williams' testimony criticized by the IG concerned the reasoning used by Williams to conclude that urea nitrate served as the main charge of the World Trade Center bomb. *See* IG Report at 95–134. Specifically, Williams testified that the Defendants had the capacity to manufacture approximately 1200 pounds of the explosive urea nitrate, and that the main explosive used in the World Trade Center bomb consisted of approximately 1200 pounds of urea nitrate. The IG found that Williams' testimony concerning the size of the bomb that the Defendants' could have constructed and the size of the

conduct at the FBI Laboratory. Hearing Tr. at 225.

22. Apparently, the conversation with Haldimann ultimately led Whitehurst to write a letter to the General Counsel of the FBI questioning the objectivity of one of the prosecutors, Assistant United States Attorney Henry DePippo. Hearing Tr. at 235. Whitehurst believed that DePippo "could have been the fellow where Mr. Haldimann got his statements from". *Id.* at 241. Whitehurst also was concerned because DePippo asked him why he added the alternate explanations to his dictations. *Id.* at 256.

At the hearing, Mr. Stern attempted to use the issues raised in Whitehurst's letter to the FBI General Counsel to argue that DePippo somehow pressured Whitehurst to alter his findings. *See Id.* at 249–66. As Whitehurst testified, however, nothing could be further from the truth. Whitehurst stated at the

Hearing that: "I don't think Mr. DePippo was pressuring me to lie". *Id.* at 256. Whitehurst also testified that DePippo never asked him to remove any alternate explanations from his reports. *Id.* at 262. This testimony is consistent with Whitehurst's trial testimony as a defense witness in *United States v. Omar Ahmad Ali Abdel Rahman*, S5 93 Cr. 181(MBM) (hereafter *"Abdel Rahman "*), that he "felt no pressure from the lawyers on the prosecution team." *See* IG Report at 144.

In sum, there is absolutely no evidence that the prosecutors in this case pressured Whitehurst or engaged in any other unethical conduct. Moreover, as Whitehurst's testimony and the IG Report demonstrate, the evidence is precisely the opposite.

23. I note that, aside from the three areas criticized by the IG, Abouhalima has not taken issue with any other areas of Williams' testimony.

World Trade Center bomb was "outside his area of expertise" and "deeply flawed".[24]

Finally, the IG criticized Williams' testimony on cross-examination concerning his failed attempt to prevent certain language in Whitehurst's dictations—the language stating possible alternate reasons for the presence of urea and nitric acid on debris samples—from being included in the July Report. *See* IG Report at 134–37. *See also infra* Part I(A)(3)(b). The IG concluded that Williams' answers were "at a minimum, misleading" when he denied that he was "dissatisfied" with the inclusion of alternate reasons in the dictations. IG Report at 137.

### B. Abouhalima's Legal Claims

#### 1. Interests of Justice

Abouhalima argues that a new trial is warranted as a result of the newly discovered evidence contained in Whitehurst's allegations and the IG Report. All the new evidence offered by Abouhalima concerns the scientific evidence supporting the government's theory that the main charge of the World Trade Center bomb was urea nitrate.

 Federal Rule of Criminal Procedure 33 provides that I may grant a motion for a new trial "if the interests of justice so require." Fed.R.Crim.P. 33. Here the interests of justice do not require a new trial because there can be no dispute that the main charge of the World Trade Center bomb was, in fact, urea nitrate. The mastermind of the plot, Ramzi Yousef, clearly stated that the main charge

was urea nitrate in his post-arrest statement.[25] Yousef Stmt. at 11.

Whatever flaws there may be in the scientific evidence supporting the Urea Nitrate Theory, the theory's conclusion—that the bomb's main charge was urea nitrate—has not been and cannot be challenged. Thus, insofar as the jury may have relied on flawed scientific evidence to accept the Urea Nitrate Theory, Abouhalima cannot credibly claim any injustice because the Theory itself is true—the main charge was urea nitrate.

Moreover, as detailed below, even if I were to put Yousef's post-arrest statement aside, Abouhalima's claims would still fail.

#### 2. Alleged Newly Discovered Evidence of Perjured Testimony

Abouhalima argues that a new trial is mandated because newly discovered evidence indicates that the government knew, or should have known, that Williams' provided "false and misleading" testimony.

 To prevail on a claim based on newly discovered evidence of false testimony by a government witness, a defendant must first demonstrate that the witness, in fact, committed perjury. *United States v. Torres*, 128 F.3d 38, 49 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1399, 140 L.Ed.2d 657 (1998). Once that requirement has been met, the grant of a new trial depends on the "materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." *United States v. Wong*, 78 F.3d 73, 81 (2d Cir.1996) (internal quotation marks and citation omitted).

---

24. The IG Report stated:
 Normally, the way a crime laboratory determines the main charge of an exploded bomb is by finding unconsumed particles or distinctive byproducts of the explosive among the residue. The search for such particles is made by a forensic chemist ... [I]n the World Trade Center case ... [the] chemists did not find any residue identifying the explosive. Williams' purported identification of the explosive filled that void.

IG Report at 96. The IG Report noted, however, that the "void" did not refer to the strength of the government's case, but rather "the absence of chemical evidence identifying the main charge." IG Report at 96 n. 45.

25. I note that copies of Yousef's post-arrest statement were provided to all counsel prior to the Hearing. In fact, one of Abouhalima's claims is based almost entirely on Yousef's statement. *See infra* Part III(A).

If the prosecution was unaware of the perjury at the time of trial, the defendant must "show that the jury probably would have acquitted in the absence of the false testimony" to prevail on his motion for a new trial. *Torres*, 128 F.3d at 49. On the other hand, if the prosecution knew or should have known of the perjury, a new trial is warranted "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." [26] *Id.* (internal quotation marks and citation omitted).

Even if the prosecution knew of the perjury, if "independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial." *Wong*, 78 F.3d at 82 (citing *United States v. Reyes*, 49 F.3d 63, 68 (2d Cir.1995)).

### a. Evidence that Williams Perjured Himself and the Prosecution's Alleged Knowledge Thereof

As a threshold matter, Abouhalima has failed to demonstrate that Williams' problematic testimony rises to the level of perjury.[27] Similarly, Abouhalima has not come forward with any credible evidence to support his claim that prosecutors knew or should have known of the alleged perjury.[28] Realizing, however, that Abouhalima claimed in his papers and at the Hearing that he could produce witnesses to substantiate his claims of perjury and the prosecutors' knowledge thereof, I will assume that Abouhalima could have done so, and thus, will not rest my decision on those flaws in his claim.

### b. Independent Evidence of the Defendants' Guilt

Abouhalima's claim contains a fatal flaw that no witness or other evidence could possibly remedy—the fact that the jury was presented with ample evidence independent of Williams' testimony to conclude that the main charge of the World Trade Center bomb was urea nitrate.

The evidence included the fact that urea nitrate was found both at the bomb factory and the storage unit, along with chemicals and materials necessary for building such a bomb. The evidence also demonstrated that the Defendants purchased these materials and accepted their delivery. Traces of the chemicals were found on Abouhalima's clothing. Moreover, the manuals in the terrorist kit seized from Ajaj contained

---

**26.** In his papers, Abouhalima states that an entirely different standard applies. Abouhalima states that:

> The standard for reversal of a conviction for the introduction of false testimony is the reasonable likelihood that there would have been an effect on the verdict without it; the standard for reversal for the introduction of false testimony with prosecutorial knowledge is the possibility that there would have an affect [sic] on the verdict without it.

Defendant Abouhalima's Memorandum in Compliance with the Court's Orders, dated February 8, 1999, at 16. Not only is this a misstatement of the standard for a new trial based on perjured testimony, it is also a misstatement of the principles stated in the case upon which Abouhalima purports to rely. *See Sanders v. Sullivan*, 863 F.2d 218, 225–26 (2d Cir.1988).

**27.** To satisfy this element, Abouhalima must meet the legal standard for perjury—that is, he must demonstrate that Williams "knowingly and willingly" gave "materially false" testimony. 18 U.S.C. § 1001(a)(2). The evidence adduced at the Hearing certainly does not satisfy this standard. As the IG Report states:

> we view Williams' testimony based on standards applicable to competent forensic scientists. The impact of Williams' errors under a legal analysis is a matter beyond the scope of this Report.

IG Report at 131, n. 76. The fact that Williams' conclusions concerning the main charge of the World Trade Center bomb may not have been acceptable to "competent forensic scientists", certainly does not render them perjurious.

**28.** Moreover, Dr. Whitehurst testified at the hearing that "nobody in the U.S. Attorney's office" knew of the problems with Williams' testimony. Hearing Tr. at 343–44.

directions for the construction of a urea nitrate bomb.[29]

Moreover, the jury was presented with overwhelming evidence of the Defendants guilt entirely independent of the evidence concerning the chemical composition of the bomb's main charge. *See supra* at 246–47.

Accordingly, Defendant's motion for a new trial as a result of Williams' testimony must be denied.[30]

## II. *Abouhalima's Ineffective Assistance of Counsel Claims*

In his Rule 33 motion, Abouhalima claims that his trial counsel—Hassan Ibn Abdellah, Esq.—rendered constitutionally deficient legal representation. Specifically, Abouhalima argues that his trial counsel was ineffective for failing to: (i) move to dismiss the indictment as a result of alleged United States involvement in Abo-

uhalima's alleged torture in Egypt; (ii) move for suppression of evidence taken from a search of Abouhalima's home; and (iii) raise the issue of alleged violations of the Vienna Convention.[31]

As the discussion below makes clear, Abouhalima has failed to demonstrate that his trial counsel's failure to file these meritless motions prejudiced him in any way. Accordingly, all of these ineffective assistance of counsel claims must be denied.[32]

### A. Trial Counsel's Failure to Argue American Involvement in Abouhalima's Alleged Torture in Egypt

Immediately after the World Trade Center bombing, Abouhalima left the United States for the Middle East and eventually traveled to Egypt. Abouhalima claims that, after arriving in Egypt, he was kid-

29. While Williams' testimony that the FBI used these instructions to create a urea nitrate bomb has been called into question, his testimony does not change the fact that the manuals taken from Ajaj contained what purported to be instructions for the construction of a urea nitrate bomb. It is therefore irrelevant that the instructions might not have been "workable", as Whitehurst queried.

30. After the Hearing, Abouhalima submitted a "Memorandum of Facts", in which he asserts an entirely new claim that "the defense was not notified in advance of the specifics of Williams' testimony which were found after trial to be invalid and misleading." Memorandum of Facts at 1.

I am at a total loss as to the legal relevance of this claim. Abouhalima was provided with all the materials upon which Williams purported to rely prior to trial. He thus had the opportunity to retain his own expert to review the materials, observe Williams' testimony, and testify as to whether the materials supported Williams' testimony. Thus, there is absolutely no merit to his claim that his rights were somehow violated.

31. Abouhalima also originally argued that his trial counsel was ineffective for failing to move for suppression of his statements to American law enforcement officials aboard the airplane that transported him to New York. He argued that the statements were the product of threats and coercion, and also

elicited without a proper waiver of his *Miranda* rights. As detailed in Appendix B, filed herewith under seal, Abouhalima chose to withdraw these claims at the Hearing.

32. While the discussion that follows addresses solely the prejudice prong of the *Strickland* inquiry, I note that Abouhalima has also failed to come forward with evidence demonstrating any objectively unreasonable attorney error. Mr. Stern refused to call either Attorney Abdellah or Abouhalima himself to testify at the Hearing—despite the fact that I repeatedly stressed the need for him to do so. I have been presented with no direct evidence with which to assess the reasonableness of Attorney Abdellah's conduct in light of his knowledge and communication with Abouhalima at the time. *See supra* at 248–49. While Abouhalima's ineffective assistance of counsel claims could fail solely as a result of this defect, for purposes of completeness, I will also examine Abouhalima's claims in light of the second prong of the *Strickland* inquiry.

I must also note that despite Mr. Stern's challenge to Attorney Abdellah's counsel and his subsequent failure to provide Attorney Abdellah the opportunity to discuss his representation of Abouhalima at the Hearing, I found Attorney Abdellah and his associates to be highly dedicated, totally professional, honorable and competent counsel.

naped by Egyptian authorities and subjected to torture for ten days prior to being turned over to American law enforcement agents in Egypt on March 24, 1993. He further alleges that the kidnaping and torture occurred with the knowledge, acquiescence and involvement of American officials.

Abouhalima contends that evidence of United States involvement in his alleged torture at the hands of Egyptian authorities gave rise to an actionable claim for dismissal of the indictment pursuant to *United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974). Thus, he argues that Attorney Abdellah was ineffective for failing to raise this issue.

In *Toscanino*, the United States Court of Appeals for the Second Circuit ruled that a court must divest itself of jurisdiction over a criminal defendant where such jurisdiction was "acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." 500 F.2d at 275. The defendant in *Toscanino* claimed that paid agents of the United States abducted him from Uruguay, brutally tortured and interrogated him for seventeen days before bringing him to the United States and turning him over to United States officials. *Id.* at 269–70. The defendant also alleged that United States officials organized the abduction and torture, were kept aware of the torture and interrogation, and actually were present and participated in portions of the interrogation. *Id.* at 270.

In light of these allegations, the Court of Appeals remanded the case for:

an evidentiary hearing with respect to Toscanino's allegations of forcible abduc-

tion only if, in response to the government's denial, he offers some credible supporting evidence, including specifically evidence that the action was taken **by or at the direction of United States officials.** Upon his failure to make such an offer, the district court may, in its discretion, decline to hold an evidentiary hearing.

*Id.* at 281 (emphasis added). Following the remand, the district court in *Toscanino* directed the defendant to submit "credible evidence supporting the claim that his alleged abduction was taken by or at the direction of United States officials." 398 F.Supp. 916, 916–17 (E.D.N.Y.1975). After reviewing the materials submitted by the defendant, the district court declined to hold an evidentiary hearing, ruling that Toscanino had failed to meet his burden. *Id.* at 917.

Following the district court's lead in *Toscanino*, I ordered Abouhalima to submit prior to the Hearing "a clear and concise listing of all credible supporting evidence—not assertions or conjecture, but evidence—in his possession that demonstrates American involvement in Abouhalima's alleged torture." *United States v. Salameh*, No. 93 Cr. 180, 1999 WL 38185 at *4 (S.D.N.Y. January 27, 1999). In response to my Order, Abouhalima provided a listing that, he claimed, constituted the necessary "credible supporting evidence" to trigger a *Toscanino* hearing.

The "evidence" in the listing consisted chiefly of an affidavit submitted by Abouhalima, as well as telephone conversations taped by FBI operative Emad Salem.[33] A review of both the affidavit and

---

33. Abouhalima also listed three additional pieces of "evidence" that merit only brief mention. First, he pointed to public information indicating that torture is regularly employed by Egyptian law enforcement. I fail to see how such information demonstrates that Abouhalima was, in fact, subjected to torture. Moreover, such information provides no evidence at all of American involvement in any alleged torture.

Second, he alleged that the United States government received reports from the Egyptian government concerning Abouhalima's statements to Egyptian authorities, and that these reports were given to the Unites States government while Abouhalima was still in Egyptian custody. Even if this allegation were proven true, the fact that the Egyptian government provided the United States government with such reports does not demon-

the tapes reveals that Abouhalima has failed to come forward with any credible evidence of United States involvement in his torture. Thus, he has failed to even meet the standard for an evidentiary hearing under *Toscanino*.

### 1. Abouhalima's Affidavit

 Abouhalima's affidavit describes his experiences from the time he was arrested by Egyptian authorities in Egypt after the World Trade Center bombing until his arrival in the United States approximately ten days later. *See* Abouhalima Ex. in Support 2.[34] The affidavit asserts a harrowing picture of Abouhalima's torture at the hands of his Egyptian captors. It also contains information that, Abouhalima argues, demonstrates American involvement in his mistreatment and interrogation.

Specifically, Abouhalima argues that:

United States involvement is evidenced by the fact that [Abouhalima's] torturers interrogated him about the murder of Meir Kahane and the explosion at the World Trade Center, crimes on American soil with only American conse-

quences. They accused of him [sic] things about his life in America which they must have heard from Emad Salem or other American law enforcement sources. They asked him about Mousab Yassin, an Iraqi doctor, and Ramzi Yousef and theorized that these men were operatives of Iraqi intelligence involved in the World Trade Center bombing, the same theory put forth by FBI agent John Anticev in conversation with Emad Salem on one of Salem's recorded phone conversations. The torturers told [Abouhalima] that the FBI allowed him to come to Egypt in order to capitalize on what would happen after his capture there. [Abouhalima] overheard his torturers talking about his saying the things the Americans wanted him to say, and he heard them getting information in English from someone and then using that information to question him during the torture.

Abouhalima's 1995 Memorandum at 18.[35] Even if proven true, these allegations cannot constitute credible evidence of American involvement in Abouhalima's alleged torture and interrogation.[36]

strate that the interrogation and torture of Abouhalima took place by or at the direction of the United States.

Finally, Abouhalima argues that the government's failure to respond to his inquiry about what it did before March 24, 1993, to extricate him from Egypt somehow demonstrates American involvement in his torture. On its face, this argument is totally baseless.

It also bears mentioning here that Abouhalima is an Egyptian citizen who voluntarily returned to Egypt and apparently was arrested by Egyptian officials for his involvement in an Egyptian crime. Moreover, Egyptian officials had been provided with information that Abouhalima was plotting other actions to destabilize the Egyptian government. *See infra* Part II(A)(2)(a). Assuming Abouhalima was tortured in Egypt, presumably these were the true reasons why.

**34.** References to "Abouhalima Ex. in Support" refer to the compendium "Exhibits in Support of Appellant Abouhalima's Motion for Review or Remand for District Court Determination of Motion for Dismissal or New Trial on Grounds of Ineffective Assistance of

Counsel, Governmental Misconduct, Denial of Fourth, Fifth and Sixth Amendment Rights, and New Evidence", filed in the Second Circuit Court of Appeals.

**35.** References to "Abouhalima's 1995 Memorandum" refer to "Appellant Mahmoud Abouhalima's Memorandum of Law in Support of his Motion for Disclosure of Evidence, this Court's Review or Remand for District Court Determination of Motion for Dismissal or New Trial on Grounds of Ineffective Assistance of Counsel, Governmental Misconduct, Denial of Fourth, Fifth, and Sixth Amendment Rights and New Evidence", filed in the Second Circuit Court of Appeals.

**36.** I note, however, that Abouhalima's contention that his interrogators asked him "things about his life in America which they must have heard from Emad Salem or other American law enforcement sources" is simply not true with regard to at least one "thing"—a conversation that he had with Siddiq Ali. Testimony in the *Abdel Rahman* trial revealed that the Egyptians obtained information about Abouhalima's conversation with Siddiq Ali

In *United States v. Lira,* 515 F.2d 68 (2d Cir.), *cert. denied,* 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975), the United States Court of Appeals for the Second Circuit rejected a virtually identical *Toscanino* claim. In *Lira,* the defendant alleged that he had been "abducted from Chile and tortured by agents of the United States Government" and then brought to the United States for trial. *Id.* at 69. The defendant specifically alleged that the Chilean police arrested him, blindfolded and beat him, tortured him with electric shocks and questioned him about a co-conspirator named in the U.S. indictment.

Despite his claims, the Court of Appeals held that the defendant in *Lira* failed to provide credible supporting evidence of American involvement in his torture:

> The only suggestion of possible involvement on the part of United States officials comes from [defendant's] testimony that he heard English spoken during the time of his torture in Santiago, that he saw [United States Drug Enforcement Agency] Special Agents at the [Chilean] Naval Prosecutor's office, and that he was told that his photograph was "for the Americans." However there was no evidence that American agents were present at or privy to his interrogation or that the persons overheard to speak English were Americans, much less Government agents ... Thus on this record there was no direct evidence of any misconduct on the part of the United States Government.

*Id.* at 71.

Because Abouhalima's claims are essentially the same as those lodged in *Lira,* it is clear that the allegations in his affidavit—even if proven true—cannot constitute sufficient credible evidence of American involvement in his interrogation and alleged torture at the hands of Egyptian authorities.

The Second Circuit's opinion in *Lira* is also significant because the court rejected the defendant's argument that the government should be held "vicariously responsible" for his torture because it requested his arrest and expulsion, and thus, "placed the matter in motion." *Id.* The Second Circuit ruled that the United States government:

> can hardly be expected to monitor the conduct of representatives of each foreign government to assure that a request for extradition or expulsion is carried out in accordance with American constitutional standards.

*Id.* As such, even if proven true, Abouhalima's allegation that the United States "probably" instigated his arrest in Egypt and failed to exercise its power to stop his alleged torture does not provide any support for an actionable *Toscanino* claim. *See* Abouhalima's 1995 Memorandum at 19.

## 2. The "Salem Tapes"

■ Abouhalima also claims that transcripts of telephone conversations between FBI informant Emad Salem and law enforcement officials provide evidence of American involvement in his alleged torture. Despite Abouhalima's contentions, an examination of the transcripts as well as other related evidence reveals that the Salem tapes provide no evidence whatsoever of such involvement by the United States.

In order to properly assess Abouhalima's claims, a brief review of Salem's background and relationship with the FBI is necessary.[37] Born in Egypt, Salem

from an **Egyptian** informant in New York who had a relationship with Abouhalima and many of his confederates. *See infra* note 44. Moreover, it seems likely that the Egyptians obtained other information from the same informant which they then used in their interrogation of Abouhalima.

**37.** Salem's work as an FBI informant was described in excruciating detail during his testimony in the *Abdel Rahman* trial. The instant discussion of Salem's background and relationship with the FBI is drawn from that testimony. *See Abdel Rahman* Tr. at 4557–4655.

joined the Egyptian army in 1968 and served in various capacities until 1987, when he retired from the military and moved to the United States. After arriving in the United States, Salem worked at several jobs in New York City.

In late 1991, the FBI approached Salem for information, seeking his services as a paid confidential informant. Specifically, the FBI asked Salem to infiltrate a group of the followers of Sayyid Nosair, a militant Islamic leader in the New York area. At the time the FBI approached Salem, Nosair was standing trial in New York State Supreme Court on charges stemming from the murder of Rabbi Meir Kahane.

Salem eventually agreed to work with the FBI and successfully infiltrated Nosair's group—providing the FBI with valuable information about the group's activities, including the activities of another radical Islamic leader, Sheikh Omar Ahmad Ali Abdel Rahman ("Sheikh Abdel Rahman"). Much of the information was conveyed through telephone conversations between Salem and members of the FBI/NYPD Joint Terrorism Task Force. Salem continued to serve as a paid confidential informant until September 1992, when the FBI and Salem parted ways after disagreements over Salem's compensation, willingness to testify in future prosecutions and difficulties concerning a polygraph examination.

After the World Trade Center bombing and the linking of Mohammad Salameh—a known associate of Nosair's—to the bombing, Salem began to again provide information to the FBI. As before, much of the information was exchanged through telephone conversations. Salem provided the government with valuable information concerning the suspects in the World Trade Center bombing, as well as other related conspiracies.

Both before and after the World Trade Center bombing, Salem apparently taped all his telephone conversations, including those with law enforcement officials. Transcripts of the conversations were provided to counsel prior to trial (hereafter the "Salem Tapes" or "Tapes").[38]

Abouhalima argues that the Salem Tapes provide evidence of United States involvement in Abouhalima's alleged torture. Specifically, Abouhalima argues that:

> The transcripts evidence that Salem was a double agent working for both the American and Egyptian FBI's, that [Salem] had advanced and detailed knowledge of appellant Abouhalima's travels in Saudi Arabia and arrest at his parent's home in Egypt and that [Abouhalima's] family was being threatened by torturers, that Salem warned his FBI handlers about the torture and threats and that [Abouhalima] would be killed or brainwashed if he was not immediately extricated from Egypt ... and that his directions about how [Abouhalima] should be extricated were followed by the FBI to the letter. The tapes also contained the FBI admission that the State Department was already involved in getting [Abouhalima] back from Egypt prior to Salem's notice and warnings, and that the FBI, with Salem's assistance had been targeting Sheikh Abdel Rahman's followers for years. The tapes also indicate that the FBI

38. The taping system employed by Salem was described by the government in its November 9, 1993 letter to Judge Michael B. Mukasey in connection with pre-trial proceedings in the *Abdel Rahman* trial:

> Throughout the time of his cooperation with law enforcement, Salem maintained a recording system at his home. The system worked automatically. Individuals were not "targeted" for recording; rather, all

calls were recorded. Salem kept numerous cassette tapes, and calls were haphazardly recorded over other calls. There was no system regarding which conversations should be maintained and which not.

Abouhalima Ex. in Support 28, at 2. I also note that the conversations on the Tapes are not dated, and that Salem did not keep track of when the conversations took place.

suspected Salem of being involved in the World Trade Center Explosion.

Motion For Review or Remand at 21.[39] A review of the Salem Tapes reveals not only that most of the above-listed assertions concerning the contents of the Tapes are entirely unfounded, but also that the Tapes contain no evidence at all of American involvement in Abouhalima's alleged torture.[40]

### a. Salem's Alleged "Double-Agent" Status

Abouhalima claims that the Tapes reveal that Salem served as a "double agent"—nefariously providing information to both American and Egyptian authorities, and presumably, shuttling information concerning Abouhalima's incarceration between the two nations. The truth is far more benign than Abouhalima contends.

As detailed in a letter from the government to Judge Michael B. Mukasey prior to the *Abdel Rahman* trial, Salem twice engaged in a series of conversations with Egyptian intelligence officers while at the same time providing information to the FBI. *See* Abouhalima Ex. in Support 28.

The first episode occurred in late 1991, shortly after Salem infiltrated Nosair's group. Salem uncovered certain information concerning the group's activities—activities that threatened the stability of the Egyptian government. Salem wanted to provide this information to Egyptian authorities but first sought the permission of

the FBI. The FBI granted its permission, and Salem informed two individuals connected with the Egyptian government that he had important information. Salem was eventually contacted by an Egyptian intelligence officer. Salem twice met with the officer to convey the information concerning Nosair's group. After those two meetings, Salem never spoke to the officer again.

The second episode occurred in the Spring of 1993 following the World Trade Center bombing when Salem renewed his relationship with the FBI. At that time, Salem engaged in telephone conversations with acquaintances from his days in the Egyptian military—individuals who, at that time, were apparently still members of the Egyptian military intelligence service.

In those conversations, Salem discussed several issues but never revealed that he was cooperating with American authorities. Moreover, there is scant reference to Abouhalima in these conversations. Abouhalima's confinement was never discussed, no information concerning his capture and imprisonment was conveyed, and there is not even the suggestion that Salem was providing direction or input into Abouhalima's interrogation or alleged torture on behalf of American officials.

Thus, these conversations provide no evidence of American involvement in Abo-

39. Citations to "Motion for Review or Remand" refer to the Affidavit attached to Abouhalima's "Notice of Motion for Review or Remand for District Court Determination of Motion for Dismissal or New Trial", dated June 23, 1995, and filed in the Second Circuit Court of Appeals.

40. One of Abouhalima's assertions barely merits mention—that Salem was a suspect in the World Trade Center bombing. Presumably, this assertion is based on Salem's comment in the Tapes that, during a visit to FBI headquarters in New York, he saw photographs of several individuals pasted on a board, including a picture of himself. At the *Abdel Rahman* trial, Salem described his ex-

change with FBI Agent John Anticev after noticing his photo:

A. I said, "Why you putting my picture here? This is suspects?" And he [Anticev] said, "No, it's the people—our assistant put this for the people who get mugshots. **You are not a suspect.**" And that was it.

*Abdel Rahman* Tr. at 5015 (emphasis added). Similarly, FBI Special Agent Nancy Floyd assured Salem in the Tapes that he was not a suspect. *See* Abouhalima Ex. in Support 24, at 23. Thus, Abouhalima's contention that the tapes evidence that Salem was a suspect in the bombing and that this somehow evidences American involvement in his alleged torture in Egypt is entirely without merit.

uhalima's arrest and alleged torture.[41]

### b. Salem's Alleged Knowledge of Abouhalima's Travels, Arrest and Incarceration in Egypt

Abouhalima attempts to overcome the absence of evidence of American involvement in Abouhalima's alleged torture in the conversations between Salem and Egyptian authorities by pointing to conversations on the Tapes between Salem and American law enforcement officials. Abouhalima contends that in these conversations, Salem conveyed to American officials "advanced and detailed knowledge" of the circumstances surrounding Abouhalima's travel to Egypt, as well as his arrest and alleged torture in Egypt—knowledge that, Abouhalima asserts, could only have been obtained through Salem's contacts in Egyptian intelligence. Abouhalima argues that Salem then conveyed this knowledge to the FBI, thus evidencing American involvement in Abouhalima's arrest and alleged torture.

A review of the Salem Tapes reveals, however, that Abouhalima's contentions are entirely without merit. As detailed below, it is clear from the Tapes that Salem's knowledge was not "advanced", far from "detailed" and was not obtained from Egyptian intelligence.[42]

### i. Salem's Alleged Knowledge of Abouhalima's Travels and Arrest in Egypt

Any review of this portion of the Salem Tapes must begin with a brief discussion of the events that led to Abouhalima's arrest in Egypt and subsequent transfer to the United States. Four days after the World Trade Center bombing, on March 2, 1993, Abouhalima fled the United States aboard a 9:00 p.m. Saudi Arabian Airlines flight from Kennedy Airport to Saudi Arabia. Trial Tr. at 5533–35; Gov't Memorandum in Response, Ex. C.[43] Abouhalima remained in Saudi Arabia for approximately ten days before traveling to Egypt. Gov't Memorandum in Response, Ex. C.

At the same time as Abouhalima was traveling through the Middle East, Abdel Haggag was providing information to the Egyptian government concerning Abouhalima's whereabouts. Haggag was an informant for Egyptian intelligence who was involved with Nosair's followers in New York. *See Abdel Rahman* Tr. at 10073–100.

On or about March 10, 1993, Haggag was involved in a conversation with Abouhalima's brother, Mohammad Abouhalima, and Siddiq Ali—both followers of Nosair and Sheikh Abdel Rahman. During that conversation, Haggag learned that Abouhalima had played an important role in the World Trade Center bombing. Haggag also learned that Abouhalima had traveled to Saudi Arabia and planned to travel to the Sudan.

Three days later, on or about March 13, Haggag spoke with Siddiq Ali who indicated that Abouhalima had not traveled to the Sudan, but rather to Egypt. Haggag then reported that information to his contacts at the Egyptian mission to the United Nations in New York City, and Abouhalima was arrested in Egypt seven hours later— at approximately 2:00 a.m. on March 13,

---

41. The same can be said of the other evidence offered by Abouhalima in support of his contention that Salem served as a "double-agent". While this evidence may demonstrate Salem's "current association with Egyptian intelligence", it provides no evidence to support Abouhalima's claim that Salem served as an agent for the Egyptians, nor does it provide any evidence at all of American involvement in Abouhalima's arrest and alleged torture.

42. I must note, however, that even if Salem had obtained the information he conveyed to American authorities from sources in Egyptian military intelligence, that still does not demonstrate that the United States directed or was in any way involved in Abouhalima's arrest and alleged torture.

43. "Gov't. Mem. in Response" refers to "Government's Memorandum in Response to Defendant's Notices of Intention to Call Certain Witnesses", dated February 16, 1999.

1993.[44] Abouhalima Ex. in Support 2, at 1.

Salem's knowledge of Abouhalima's whereabouts—and thus the FBI's knowledge—lagged considerably behind Abouhalima's actual movements and Haggag's knowledge thereof. Salem first learned that Abouhalima had fled the United States for Saudi Arabia on March 15, 1993, approximately two days after Abouhalima's arrest in Egypt. *Abdel Rahman* Tr. at 5016–17. Salem learned this information in a conversation with Mohammad El-Gabrowny at Abu Bakr Mosque. Mohammad El-Gabrowny was a follower of Nosair and Sheikh Abdel Rahman, as well an acquaintance of Abouhalima's brother, Mohammad Abouhalima.[45] *Abdel Rahman* Tr. at 5017.

The next day, March 16, Salem visited the house of Mohammed El-Gabrowny, a member of Nosair's group.[46] Mohammad Abouhalima, was also at El-Gabrowny's house, and the three discussed defendant Abouhalima's whereabouts. It was then that Salem learned that Abouhalima had gone to Egypt and been arrested.

Apparently, Salem immediately called FBI Special Agent John Anticev and informed him of these facts in a conversation captured on one of the Tapes:

Salem: They arrested Ibrahim Abouhalima

Anticev: Ibrahim?

Salem: Mahmud [sic] Abouhalima

Anticev: They did?

Salem: Yeah

Anticev: Who? Where?

Salem: The Egyptian FBI

Anticev: He's over there?

Salem: Correct

Anticev: You're kidding me

Salem: I'm not playing John

\* \* \* \* \* \*

Anticev: Ok, ah .. Can I .. Can I ask how you got this?

Salem: Yes of course. His brother told me.

Anticev: His brother told you this?

Salem: He didn't told [sic] me. His brother talked to Mohammed Elgabrowny, Mohammed Elgabrowny talked to me and told me . . .

Abouhalima Ex. in Support 19, at 34.

On March 19, 1993, Mohammad Abouhalima contacted the FBI and provided the same information that Salem had provided

**44.** I note that Abouhalima also attempts to draw the inference that Haggag was somehow providing information concerning Abouhalima's presence in Egypt to the FBI at the same time as he was providing the same information to Egyptian authorities. The Tapes contain absolutely no evidence to support this inference, nor does Haggag's testimony at the *Abdel Rahman* trial or any other source for that matter.

One thing that is clear from Haggag's testimony at the *Abdel Rahman* trial is that Haggag provided Egyptian authorities with information about the activities of Abdel Rahman's followers, including informing them of a conversation that Abouhalima had with Siddiq Ali where Abouhalima asked Ali to test an explosive device. *See Abdel Rahman* Tr. at 5542–43; 10,080–81. Abouhalima claims in his affidavit that he was asked about this conversation during his interrogation by Egyptian authorities. *See* Abouhalima Aff. at 7–8.

**45.** Mohammed El-Gabrowny is also the brother of *Abdel Rahman* defendant Ibrahim El-Gabrowny.

**46.** Salem described the conversation at El-Gabrowny's house at the *Abdel Rahman* trial:

Q: What happened when you met Mohammed [sic] Abouhalima at Mohammed El-Gabrowny's house?

A: We were talking about what happened and what's going on, and he mentioned that—I told him, is Mahmud [sic] still in Saudi Arabia? He said no, he went to Cairo and he get [sic] arrested over there.

Q: When you heard that Mahmoud Abouhalima had been arrested in Cairo, what did you do?

A: I told the FBI.
*Abdel Rahman* Tr. at 5029.

three days earlier—that his brother had been arrested in Egypt and was in Egyptian custody.[47]

Thus, it is clear that Salem first learned that Abouhalima had been arrested on March 16 and that he obtained that information not from Egyptian intelligence sources, but from defendant Abouhalima's brother and Mohammed El–Gabrowny. Moreover, the Tapes contain absolutely no evidence that any American official knew that Abouhalima would be or was taken into Egyptian custody prior to Salem's conversation with Anticev.[48]

### ii. Salem's Alleged Knowledge of Abouhalima's Alleged Torture

Abouhalima also points to several exchanges between Salem and Anticev that, he contends, exhibit a "detailed knowledge" of the circumstances of Abouhalima's treatment at the hands of Egyptian authorities. Despite Abouhalima's contentions, the passages in the Tapes to which he cites provide no support for this conclusion.

The first exchange comes at the end of the conversation referenced above where Salem first informed Anticev that Abouhalima had been arrested in Egypt. Salem

indicates that Abouhalima is "under interrogation" in Egypt:

Salem: But try to get the guy quickly because he is under interrogation

Anticev: I understand

Salem: Over there now

Anticev: Yeah

Salem: Ok

Anticev: And I understand that its not a pretty on (laughter)

Salem: Well that's why I am saying that ah ... before they instruct him ... before they do things with him ... I mean they will do dirty things because they know he's ah ... ah ... ah ... Omar Ibrahim colleague

Anticev: Yeah, I'm sure the Egyptian people here have read the news paper yesterday and they know that ah we're seeking him for this bombing

Abouhalima Ex. in Support 19, at 28–29.

The second exchange cited by Abouhalima occurred in a subsequent phone conversation with Anticev. In that exchange, Salem makes various references to the

---

**47.** The fact that Mohammad Abouhalima conveyed this information to the FBI on March 19 is evidenced by the FBI report detailing his interview with officials from the FBI. Gov't Memorandum in Response, Ex. C. Moreover, because Anticev clearly states on the Tapes that Mohammad Abouhalima told the FBI about his brother's arrest in Egypt three days after Salem provided the FBI with the same information, the date that Salem first informed the FBI of Abouhalima's arrest must be March 16. Abouhalima Ex. in Support 25, at 45. *See also infra* Part II(A)(2)(c).

Salem's testimony at the *Abdel Rahman* trial also supports the conclusion that Salem first informed the FBI of Abouhalima's arrest on March 16. Salem testified that he visited El–Gabrowny's home one day after his March 15 conversation with El–Gabrowny at the Abu Bakr Mosque. Thus, Salem must have visited El–Gabrowny's home and learned of Abouhalima's arrest on March 16. Because Salem testified that he notified the FBI of Abouhali-

ma's arrest immediately after leaving El–Gabrowny's home, it is clear that Salem informed the FBI on the same day he visited El–Gabrowny's home—March 16. *See Abdel Rahman* Tr. at 5028–29.

**48.** In fact, it seems that even after Salem informed the FBI that he had learned that Abouhalima had been arrested in Egypt, the FBI was still unsure as to whether Salem's information was correct. As Special Agent Anticev mentioned to Salem in a subsequent conversation on the Tapes, Mohammad Abouhalima was the sole source of the information concerning his brother's arrest—apparently the FBI had not yet been able to independently confirm the information. Abouhalima Ex. in Support 8, at 12. Special Agent Anticev speculated that Mohammad Abouhalima could have been putting out this information "in order to throw us of the trail" and that Abouhalima could be in hiding in New York. *Id.* at ——————.

conditions that Abouhalima may be subjected to while in Egyptian custody. *See* Abouhalima Ex. in Support 8, at 11–20. At one point, Salem indicates that Abouhalima might want to be returned to the United States because of the harsh conditions in Egyptian custody. *Id.* at 13.

As to the conditions, Salem states that Abouhalima would be questioned "day and night" and put under "certain pressures" so that "they can get what they want out of him." *Id.* at 16. Salem also states that the Egyptians might keep Abouhalima for months, interrogating him while denying to American officials that he is in their custody, before killing him and announcing that:

> Abouhalima was hiding in the eastern desert in one of the tombs, the, the deserted tombs, but we find [sic] him dead with a snake bite.

*Id.* at 18.

These exchanges between Salem and Anticev certainly do not demonstrate any "detailed knowledge" of Abouhalima's alleged torture—the type of knowledge that would indicate that Salem was receiving contemporaneous descriptions, or any descriptions for that matter, of Abouhalima's alleged torture from Egyptian sources. Instead, they merely demonstrate general knowledge of interrogation tactics used by the Egyptians—tactics that Abouhalima himself argues were public knowledge as the result of reports by the State Department and other organizations.

Moreover, Salem stated to Anticev that he performed interrogations while in the Egyptian military, and thus, possessed independent knowledge about the conditions of Egyptian prisons and the treatment of prisoners.[49] *See* Abouhalima Ex. in Support 8 at 6; 9 at 23; 10 at 42.

In sum, the Tapes contain no evidence that Salem had "detailed knowledge" of the circumstances of Abouhalima's incarceration in Egypt. In fact, the only knowledge that Salem appears to have that specifically relates to Abouhalima is simply that he had been arrested—a fact that Salem learned not from Egyptian intelligence, but from Abouhalima's brother and Mohammed El–Gabrowny. Moreover, there is absolutely no evidence to support the contention that Salem was receiving any information at all concerning Abouhalima's status from Egyptian military intelligence sources.[50]

### iii. Salem's Alleged Directions Concerning Abouhalima's Extrication from Egypt

Abouhalima argues that Salem provided the FBI with directions as to how Abouhalima could be extricated from Egypt, and that this fact demonstrates that Salem was involved in facilitating American involvement in Abouhalima's alleged torture. Like Abouhalima's other arguments, there is simply no support for this contention in the Tapes.

**49.** I also note that Salem clearly states in the tapes that he could not even ask his acquaintances in Egyptian military intelligence to confirm whether Abouhalima was in Egyptian custody because they would never reveal that information over the telephone. *See* Abouhalima Ex. in Support 8, at 16.

**50.** Abouhalima also cites two additional passages in the Tapes in support of his claim that Salem had "detailed knowledge" of Abouhalima's alleged torture. Each passage merits only a brief mention.

First, Abouhalima points to a statement by Special Agent Anticev where Anticev indicates that he believes that Abouhalima may have been tortured "a little bit" while in Egypt. Abouhalima Ex. in Support 20, at 21. As made clear in the same conversation, this statement was made after Abouhalima was already in American custody at the Metropolitan Correctional Center in New York City ("MCC"). Thus, it constitutes no evidence of contemporaneous knowledge of Abouhalima's treatment while in Egyptian custody.

The same can be said for Salem's comments that Abouhalima was "kept naked in a freezing room, hanging like a piece of meat." Abouhalima Ex. in Support 23, at 38. Clear references in that conversation demonstrate that, at the time the comments were made, Abouhalima was already in custody at the MCC.

In the same conversation where Salem informed Anticev that Abouhalima had been arrested in Egypt, Salem states that:

two agents must take next flight ... the State Department must contact immediately the Egyptian authorities and confirm ... He must not be tortured and the people who go receive him, they must receive him with [sic] a certain way with pictures because the [sic] will be hanging him upside down right now.

Abouhalima Ex. in Support 21, at 34.

Later in the conversation, Anticev tells Salem that Abouhalima was a significant member of the World Trade Center bombing conspiracy and that it is "important" that he be returned to the United States for prosecution. *Id.* at 42. Anticev then asks Salem if he should call the Egyptian consulate in New York to aid in this effort. *Id.* Salem states that the consulate would be of no assistance, and that even if the highest ranking member of the FBI in New York called the consulate, it would not make a difference. *Id.* Instead, Salem states that the "State Department must call the Egyptian FBI" if Abouhalima is to be returned to the United States. *Id.*

Notwithstanding these comments by Salem, it is not surprising that FBI agents flew to Egypt to take custody of Abouhalima, that photographs of Abouhalima were taken by those agents and that the State Department may have played a role in negotiating for Abouhalima's return. Perhaps Abouhalima would have the court believe that, had Salem not provided the "directions" to Anticev, FBI agents would have used some other mode of transportation to Egypt, not documented Abouhalima's condition when they took custody of him and not allowed the diplomatic arm of this government to play any role in the negotiations with a foreign government for his transfer.

· Clearly such an argument cannot be credited, and the fact that Salem provided such general "directions" to Anticev constitutes no evidence that could possibly support Abouhalima's claims of American involvement in his alleged torture.

### c. The FBI's Alleged Knowledge of Abouhalima's Whereabouts and Efforts to Obtain Custody Over Him Prior to Salem's Disclosures

Abouhalima contends that the Tapes establish that the FBI knew Abouhalima's whereabouts and engaged in efforts to retrieve him prior to Salem's disclosure to Anticev. There is absolutely no support for this argument in the Tapes.

Abouhalima first points to a passage in the Tapes where Salem describes to FBI Special Agent Nancy Floyd a meeting he attended at FBI headquarters after the World Trade Center bombing. During the meeting, Salem provided the FBI with information concerning suspects in the bombing, but was interrupted when an agent reported that two other agents were following a man they believed to be Mahmoud Abouhalima. Apparently, the agents followed the man to Newark Airport, where he stopped for a moment before leading the agents to other destinations. In the end, the individual never left the country. *See* Abouhalima Ex. in Support 24, at 14–15.

Abouhalima argues that this passage provides evidence that the FBI was following Abouhalima prior to his departure from the country, and thus must have known of his whereabouts. Aside from the obvious flaw in this argument—the individual being followed never left the country—there is another more fundamental flaw. This individual could not possibly have been Abouhalima.

Abouhalima left the United States on March 2, 1993. *See supra* Part II(A)(2)(b)(i). Salem's visit to FBI headquarters and the pursuit of the individual thought to be Abouhalima to Newark Airport took place on March 6, 1993—four days after Abouhalima had left the coun-

try.[51] Thus, that individual clearly was not Abouhalima.[52]

Abouhalima also points to statements by Special Agent Anticev that, he contends, demonstrate that the FBI was "working on" Abouhalima's extrication from Egypt before Salem informed Anticev that Abouhalima was in Egyptian custody.

The conversation to which Abouhalima cites took place after Salem first informed Special Agent Anticev of Abouhalima's arrest in Egypt. In the conversation, Salem complains to Special Agent Anticev that he has not been adequately compensated for the valuable information that he provided to the FBI. Abouhalima Ex. in Support 25, at 44–45. Anticev explains that he agrees that Salem had earned a payment for past information, especially because:

> the fact that you told us before Mohammad Abouhalima, where, uh, where, where Abouhalima was. Cause he [Mohammad Abouhalima] told us when we interviewed him on that day. But we already had a three day head start on that when you told us. You know, the State Department was already working on it [at which point Salem interrupts

with "Yeah" and Anticev continues] Before Mohammad told us.

*Id.* at 45.

Abouhalima argues that, in this passage, Anticev reveals that the FBI knew that Abouhalima had been arrested in Egypt three days before Salem reported that Abouhalima was in Egyptian custody. This is an inaccurate reading of Anticev's comments.

The meaning of Anticev's comments is clear—Salem deserves compensation for informing the FBI on March 16, 1993 that Abouhalima had been arrested in Egypt, three days before Abouhalima's brother, Mohammad Abouhalima, notified the FBI on March 19, 1993. That fact is made even clearer by Salem's comments later in the conversation that he deserved compensation because, had he not relayed the information about Abouhalima to the FBI and given them this "head start", Abouhalima would have been killed while in Egyptian custody. *Id.* at 45–46.

Thus, it is clear that the Tapes provide absolutely no evidence that the FBI was "working on" extricating Abouhalima, or even aware of the fact that he was in Egyptian custody prior to Salem's notification.[53]

---

51. The fact that Salem's visit to FBI headquarters occurred on Saturday, March 6, 1993, is evidenced by clues throughout Salem's conversation with Special Agent Floyd. Salem states that he visited the FBI's office on "Saturday" at noon. Abouhalima Ex. in Support 24, at 9. During this visit, the agents asked Salem to examine a passport and an address book, which from Salem's description appear to be items seized from Mohammad Salameh on the day of his arrest—March 4, 1993. *Id.* a 12–14. Also, while still discussing his visit to FBI offices, Salem makes reference to the arrest of *Abdel Rahman* defendant Ibrahim El–Gabrowny which also took place on March 4, 1993. *Id.* at ——.

Thus, Salem's visit to FBI headquarters must have taken place, at the earliest, on the Saturday after Salameh's arrest on March 4— March 6, 1993. Because Abouhalima fled the country the evening of March 2, the individual that the FBI was following at the time Salem visited FBI headquarters could not have been Abouhalima.

52. Moreover, the fact that the FBI thought that they were following Abouhalima demonstrates that the FBI had no knowledge of Abouhalima's actual whereabouts in the Middle East at the time Salem visited FBI headquarters on March 6, 1993.

53. Abouhalima also points to the fact that the FBI kept tabs on Abouhalima, as well as other followers of Nosair and Abdel Rahman, prior to the World Trade Center bombing. He argues that this fact somehow supports a finding that the FBI must have known that Abouhalima had gone to Egypt, and thus, must have been involved in his alleged torture. The flaws in this argument are readily apparent.

First, I fail to see how the FBI's surveillance of Abouhalima at certain times prior to the World Trade Center bombing in any way evidences that the FBI knew his whereabouts after the bombing—especially in light of the evidence in the Tapes and elsewhere indicating that the FBI had no knowledge of Abouhalima's whereabouts until told by Salem.

## B. Trial Counsel's Failure to Move for Suppression of Evidence Seized from Abouhalima's Apartment

Abouhalima next claims that his trial counsel was ineffective for failing to move for the suppression of evidence taken from his apartment. The evidence was seized pursuant to a search warrant issued by a Magistrate Judge of the United States District Court for the District of New Jersey. Specifically, Abouhalima argues that the search warrant was issued without probable cause and that execution of the search warrant was over-broad. As detailed below, this argument is entirely without merit.[54]

### 1. Issuance of the Search Warrant

On March 18, 1993, Magistrate Judge G. Donald Haneke of the United States District Court for the District of New Jersey was presented with a search warrant for Abouhalima's apartment at 1811 Colonial Gardens, Avenel, New Jersey. Abouhalima Ex. in Support 38. The warrant called for the seizure of a broad range of materials from the apartment, including:

> personal telephone directories, lists, diaries, blueprints, charts, maps, diagrams, ledgers, journals, receipts, checks and other documents relating to the procurement of materials used in the construction or manufacture of explosive devices . . . and other evidence and things which constitute evidence of the use of an explosive device in violation of Title 18, United States Code, Section 844.

*Id.* Attached to the warrant was an affidavit from FBI Special Agent Erik Pilker stating the basis for the warrant.

In a telephone hearing in support of the warrant, Special Agent Pilker read his entire affidavit to the Magistrate Judge, providing a detailed recitation of key developments in the investigation, including the discovery of the chemicals at the storage unit, the identification of the Ryder van and the subsequent arrest of Mohammad Salameh.

Special Agent Pilker also stated in the affidavit that a gas station attendant observed a Ryder van and a Lincoln Town Car pull into his gas station in Jersey City, New Jersey at 4:00 a.m. on the morning of the bombing. According to the gas station attendant, both cars were fueled, and the driver of the Lincoln Town Car paid for the gasoline. The gas station attendant identified Salameh as the driver of the Ryder van and Abouhalima as the driver of the Lincoln Town Car.[55] *Id.*

The Magistrate Judge then reviewed this information with Special Agent Pilker:

> Magistrate: Now, if I understand what I am hearing correctly, evidence that you have accumulated is that the apartment was at the relevant time at least during February of this year, the residence of the chap who was driving

---

Second, even if the evidence demonstrated that the FBI had been surveilling the defendant after the bombing and observed him leaving the country, Abouhalima assumes that the FBI would be prescient enough to predict his eventual arrival in Egypt after originally traveling to Saudi Arabia and planning to continue to the Sudan. But even if I were to assume that the FBI were so prescient, that still leaves Abouhalima without any evidence demonstrating that the government had any involvement at all in his arrest and alleged torture.

**54.** The frivolity of this particular claim is best exemplified by the fact that only one item seized from Abouhalima's apartment was introduced by the government at trial—a magazine article on explosives. Even if I were to

assume that a motion to suppress the magazine article would have succeeded, Abouhalima still could not prevail on this claim. In order to prevail, Abouhalima would have to demonstrate "prejudice" under *Strickland*. He would have to demonstrate that had this single magazine article been suppressed, the result of his trial would have been different— an impossible burden in light of the overwhelming evidence offered against him.

**55.** The gas station attendant that provided Special Agent Pilker with this information is Willie Moosh. Moosh later testified at trial as to the events at his gas station in the early morning hours before the explosion. *See infra* Part III(A).

the Town Car that accompanied the van at 4:00 a.m. on the morning of the bombing itself, is that right?

Pilker: Correct.

Magistrate: And that the person who was driving the Lincoln was the one who in fact paid for the gas for both of the vehicles.

Pilker: Correct.

Magistrate: So that I take it then that you're asking me of course to draw the inference that if he paid for the gas he was obviously in some way connected with the chap or chaps who were in the van itself.

Pilker: That's correct.

Magistrate: Okay, I have no problem with this application. I'll be happy to authorize it ...

*Id.* Armed with the search warrant authorized by the Magistrate Judge, law enforcement agents conducted a search of Abouhalima's apartment on the morning of March 19, 1993.

## 2. Lack of Probable Cause

Abouhalima contends that trial counsel was ineffective for failing to move for suppression of the materials seized in the search of his apartment on the grounds that the search warrant was unsupported by probable cause. In order to prevail on such a claim of ineffective assistance of counsel, Abouhalima must demonstrate that there is a reasonable probability that but for counsel's error, the outcome of the proceedings would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Here there is absolutely no possibility that the outcome of the proceedings would have been different because, even if counsel had moved for suppression as Abouhalima suggests, the motion would certainly have been denied.

 In determining whether probable cause exists for a search warrant, "a judge must determine whether 'there is a fair probability that contraband or evidence of a crime will be found in a particu-

lar place.'" *Salameh,* 152 F.3d at 112–13 (*quoting Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). "Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Gates,* 462 U.S. at 235, 103 S.Ct. 2317 (internal quotation marks and citations omitted). Moreover, "great deference" is to be accorded to the judge's determination that probable cause exists, and any doubt about the existence of probable cause is to be resolved in favor of upholding the warrant. *Salameh,* 152 F.3d at 113.

 In this case, even putting deference aside, it is clear that Magistrate Judge Haneke's determination was entirely correct. The Magistrate Judge was presented with clear evidence of the connection between Salameh, the Ryder van, the chemicals at the storage shed, and the presence of Abouhalima, Salameh, and the Ryder rental van at a gas station in the early morning hours on the day of the bombing. The Magistrate Judge was also presented with testimony indicating that Abouhalima's apartment likely contained evidence relating to the bombing. Clearly this evidence more than adequately demonstrated to a "fair probability" that Abouhalima was somehow involved in the bombing of the World Trade Center, and thus, that evidence of his involvement would be contained in his home.

 Moreover, even if probable cause were lacking, a motion to suppress still would have been denied because the search was conducted in good faith reliance on the warrant. If a court determines that there was insufficient probable cause to support a search warrant, a motion to suppress will still be denied "if the court finds that the officers who conducted the search acted in good faith reliance on a facially valid warrant." *Salameh,* 152 F.3d at 114. "An officer's reliance on a warrant is not in good faith when the application supporting the warrant is so lacking in indicia of probable cause as to render offi-

cial belief in [the existence of probable cause] entirely unreasonable." *Id.* (internal quotation marks and citation omitted).

■ As explained above, the application for the warrant presented ample indicia of probable cause. Thus, reliance on the warrant by the law enforcement agents who conducted the search of Abouhalima's apartment was reasonable and in good faith.

### 3. Overbroad Execution

Abouhalima also argues that trial counsel should have moved for suppression of the materials seized in the search of his apartment on the grounds that many of the items seized were outside of the scope of the warrant. In support of this argument, Abouhalima claims that the "first things the officers seized were tapes and general books on Islam", in addition to "a commercial Arabic phone book and other forms of Arabic literature." Abouhalima's 1995 Memorandum at 61. Abouhalima also takes issue with the fact that "tax returns, books, magazines, an open box of shock absorbers, miscellaneous tapes, papers from a backpack and a file on an apartment at 1811 Colonial Gardens" were also seized. *Id.*

Abouhalima argues that the seizure of these items exceeded the warrant's authorization, rendering the search illegal and mandating the suppression of all the items obtained during the search.

■ The law in this area is clear. If the scope of a search exceeds that permitted by the terms of the underlying warrant, the subsequent seizure is unconstitutional. *Horton v. California,* 496 U.S. 128, 139, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Officials executing a warrant have some discretion, however, in interpreting the scope of the warrant. *United States v. Marti,* 421 F.2d 1263, 1268 (2d Cir.1970). Their interpretation of the scope of the warrant need not be "hyper-technical", but rather should be "commonsensical". *Johnson v. Massey,* No. 92 CV 178(JAC),

1993 WL 372263, at *3 (D.Conn. Sept. 17, 1993) (*citing United States v. Marques,* 600 F.2d 742, 751–52 (9th Cir.1979)).

■ Moreover, "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search warrant—subject, of course, to the general Fourth Amendment protection against unreasonable searches and seizures." *Johnson,* 1993 WL 372263, at *3 (internal quotation marks omitted and *quoting Dalia v. United States,* 441 U.S. 238, 257, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979)). Governmental conduct throughout searches and seizures must meet a standard of objective reasonableness. *Id.* (*citing United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985)).

■ Here it is clear that the seizure of items from Abouhalima's apartment was objectively reasonable. As discussed above, the warrant authorized the seizure of a broad range of items including a host of documents "relating to the procurement of materials used in the construction or manufacture of explosive devices", as well as "other evidence and things which constitute evidence" of Abouhalima's involvement in the bombing. Any common sense reading of such a broad authorization must include all the items seized from Abouhalima's apartment.

■ Even if one were to adopt a less sensible reading of the warrant and conclude that items outside the scope of the warrant were seized, Abouhalima's claim would still fail. When items outside the scope of a valid warrant are seized, "the normal remedy is suppression and return of those items, not invalidation of the entire search." *United States v. Matias,* 836 F.2d 744, 747 (2d Cir.1988) (citations omitted). The drastic remedy of suppression of all evidence seized is not justified unless those executing the warrant acted "in flagrant disregard" of the warrant's terms. *Id.*

Certainly the agents did not act in such blatant disregard of the warrant's terms as would justify not only suppression and return of any improperly seized items but also suppression of any items that were properly seized. *See id.* at 747–48. *See also United States v. Abdel Rahman,* No. 93 Cr. 181(MBM), 1994 WL 388918, at *2 (S.D.N.Y. July 22, 1994). Moreover, Abouhalima actually concedes that the sole item obtained in this search that was offered at trial—a magazine article on explosives—was within the scope of the search warrant. Thus, regardless of whether counsel moved for the article's suppression, it would have been admitted into evidence.

### C. Alleged Violations of the Vienna Convention

Finally, Abouhalima claims that trial counsel should have raised the issue of alleged violations of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77 (hereinafter "Vienna Convention" or "Convention").

■ Specifically, Abouhalima argues that the American law enforcement officials who took him into custody in Egypt and transported him back to the United States failed to advise him that, under the terms of the Vienna Convention, he could request that the United States government notify the consulate of his nation of citizenship—Egypt—that he had been taken into custody. *See* Vienna Convention, Art. 36(1)(b).[56] Abouhalima contends that this lapse by American authorities gave rise to an actionable claim for suppression of his post-arrest statements. Even assuming that there was a violation of the Vienna

Convention as Abouhalima suggests, Abouhalima could not have brought a successful motion for suppression of his post-arrest statement based on such a violation.

■ As a preliminary matter, it is unclear whether Abouhalima even has standing to assert a private right of action for a violation of the Convention. As a general rule, treaties of the United States do not create rights that are privately enforceable in courts. *See, e.g., United States v. Reed,* 639 F.2d 896, 902 (2d Cir.1981) ("[A]bsent protest or objection by the offended sovereign, [a criminal defendant] has no standing to raise violation of international law as an issue."); *United States v. Rosenthal,* 793 F.2d 1214, 1232 (11th Cir.) ("Under international law, it is the contracting foreign government that has the right to complain about a violation."), *modified on other grounds,* 801 F.2d 378 (11th Cir.1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 808 (D.C.Cir.1984) (Bork, J., concurring) ("Treaties of the United States, though the law of the land, do not generally create rights that are privately enforceable in courts."), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

■ Absent legislation providing a private right of action, an individual can enforce a treaty in court only if the treaty, expressly or by implication, provides for such an action. *Tel–Oren,* 726 F.2d at 808. *See also Smith v. Socialist People's Libyan Arab Jamahiriya,* 886 F.Supp. 306, 310 (E.D.N.Y.1995), *aff'd,* 101 F.3d 239 (2d Cir.1996), *cert. denied,* 520 U.S. 1204, 117 S.Ct. 1569, 137 L.Ed.2d 714 (1997). In order to provide for a private right of

---

56. Article 36 of the Vienna Convention provides in relevant part:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending state:
(b) if [the defendant] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is

arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;

Vienna Convention, Art. 36.

action, the treaty must be "self-executing," that is, "it must prescribe [ ] rules by which private rights may be determined." *Columbia Marine Services, Inc. v. Reffet Ltd.*, 861 F.2d 18, 21 (2d Cir.1988) (internal quotation marks and citation omitted).

■ "In determining whether a treaty is self-executing, courts look to the intent of the signatory parties as manifested by the language of the instrument, and, if the instrument is uncertain, recourse must be had to the circumstances surrounding its execution." *Diggs v. Richardson*, 555 F.2d 848, 851 (D.C.Cir.1976). *See also Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) (Interpretation of a treaty must begin with the language of the treaty itself, and the clear import of [the] language controls.)

While the Vienna Convention does not expressly indicate whether a private action for its enforcement is available, it does state in the "Preamble" that:

> the purpose of such privileges and immunities [set forth in the Vienna Convention] is **not to benefit individuals,** but to ensure the efficient performance of functions by consular posts on behalf of their respective States.

Vienna Convention, Preamble (emphasis added).

The courts are split as to whether this language, as well as similar language throughout the Vienna Convention, forecloses a private right of action for enforcement of rights under the Convention. *Compare Kasi v. Commonwealth*, 256 Va. 407, 508 S.E.2d 57, 64 (Ct.App.1998) ("there is no reported authority for the idea that a violation of the [Vienna Convention] creates any legally enforceable individual rights"), *and Republic of Paraguay v. Allen*, 949 F.Supp. 1269, 1274 (E.D.Va.1996), *aff'd*, 134 F.3d 622 (4th Cir.), *cert. denied*, 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) ("a private party may not seek redress for treaty violations" where treaty is "self-executing"

and Vienna Convention is "self-executing"), *with United States v. $69,530.00 in United States Currency*, 22 F.Supp.2d 593, 594 (W.D.Tex.1998) (denying motion to suppress for violation of Vienna Convention, but stating that "it appears to this court that Claimant does indeed have a right to be informed that he could communicate with the Nigerian Consulate and that this right was violated."), *and United States v. Esparza–Ponce*, 7 F.Supp.2d 1084, 1096 (S.D.Cal.1998) (citing "several courts" that have allowed individual claims of violations of the Vienna Convention to proceed, but explicitly declining to decide this "muddled" issue).

■ I need not wade into the morass over the existence of such a private right of action because, even assuming Abouhalima had standing to bring such an action, suppression of his post-arrest statements would certainly not be a proper remedy. As one court recently noted:

> [t]he exclusionary rule is designed to protect core constitutional values; it should only be employed when those values are implicated. A convention or treaty signed by the United States does not alter or add to our Constitution. Such international agreements are important and are entitled to enforcement, as written, but they are not the bedrock and foundation of our essential liberties and accordingly should not be cloaked with the "nontextual and unprecedented remedy" that protects those liberties.

*$69,530.00 in United States Currency*, 22 F.Supp.2d at 595. *See also Esparza–Ponce*, 7 F.Supp.2d at 1097 n. 9 ("The court does not hold that suppression of statements is the proper remedy for a violation of the [Vienna] Convention").

Moreover, even if suppression were a proper remedy for a violation of the Vienna Convention, Abouhalima still could not succeed on such a motion because, in order to secure such a remedy, Abouhalima must demonstrate prejudice resulting from the violation.

The issue of whether prejudice is required in order for an individual to secure any remedy for a violation of the Vienna Convention was addressed by the United States Court of Appeals for the Second Circuit in *Waldron v. INS,* 17 F.3d 511 (2d Cir.), *cert. denied,* 513 U.S. 1014, 115 S.Ct. 572, 130 L.Ed.2d 489 (1994). In *Waldron,* the petitioner, a citizen of Trinidad and Tobago, sought reversal of a decision by the Board of Immigration Appeals upholding an immigration judge's finding that the petitioner was subject to deportation. The petitioner took issue with the immigration judge's failure to inform him of his right to contact his nation's consul for assistance during the deportation proceedings.

This failure violated 8 C.F.R. § 242.2(g), which reiterates the requirements of the Vienna Convention by requiring the Immigration and Naturalization Service to inform deportees of their right to contact their consuls. The Second Circuit considered whether an alien must show prejudice from a violation of the regulation—and therefore the Vienna Convention—in order to obtain relief. The court stated that:

> [N]either § 242.2(g) nor [an unrelated regulation] are regulations which implicate fundamental rights with constitutional or federal statutory origins ... Section 242.2(g) was adopted to ensure compliance with the Vienna Convention on Consular Relations ... Article 36 of the Convention provides, *inter alia,* that aliens shall have the freedom to communicate with consular authorities of their native country ... Although compliance with our treaty obligations clearly is required, we decline to equate such a provision with fundamental rights [where prejudice is assumed], such as the right to counsel, which traces its origin to concepts of due process.

*Waldron,* 17 F.3d at 518. Thus, the Second Circuit held that a showing of prejudice was required. This prejudice requirement has been adopted by other courts where a criminal defendant has, like Abouhalima, sought suppression of statements based on allegations of similar violations of the Vienna Convention. *See Esparza–Ponce,* 7 F.Supp.2d at 1096–97.

Turning to Abouhalima's claim, he has neither argued nor demonstrated that he was prejudiced in any way by the alleged violations of the Vienna Convention. Nevertheless, it is clear that such violations could not possibly have prejudiced Abouhalima.

The provision of the Convention that Abouhalima claims was violated provided him with the opportunity to have the Egyptian consulate notified that he had been taken into American custody. Even if Abouhalima was never informed of this right, the Egyptian government was certainly well aware of his status because it was the Egyptian government itself that turned him over to American authorities in Egypt. The failure to notify representatives of the Egyptian government of facts already known to the Egyptian government could not under any circumstances be deemed prejudicial.

Clearly, there was no basis for an actionable suppression motion under the Vienna Convention.

### III. *Abouhalima's Newly Discovered Evidence Claims*

As a final matter, I must consider Abouhalima's argument that "newly discovered evidence" exists which is exculpatory and warrants a new trial. Specifically, Abouhalima points to: (i) the post-arrest statements of two co-conspirators, and (ii) the government's failure to disclose prior to trial photographs of Abouhalima showing the wounds from his alleged torture. As discussed below, each of these claims is entirely without merit.

### A. Co–Conspirators' Post–Arrest Statements

 Abouhalima claims that the post-arrest statements of co-conspirators Ramzi Yousef and Eyad Ismoil constitute newly discovered evidence that mandates a new

trial because it undermines evidence essential to the government's theory of the case. A review of the two statements, as well as the evidence adduced at the two World Trade Center bombing trials, reveals that the statements are in no way exculpatory and cannot support a motion for a new trial.

By way of background, at Abouhalima's trial, a witness for the government—gas station attendant Willie Moosh—testified to the same facts that he provided to FBI Special Agent Erik Pilker shortly after the bombing. Moosh's testimony placed Abouhalima with the Ryder van at a gas station in Jersey City, New Jersey at 4:00 a.m. on the morning before the bombing.

Following the trial, in early 1995, coconspirator Ramzi Yousef was captured in Islamabad, Pakistan, and on February 7, 1995, Yousef gave a statement to American law enforcement agents.[57]

In relevant part, the FBI report of Yousef's statement reads:

> [Yousef] stated that Abouhalima had never been present with the Ryder van at a Jersey City, New Jersey, gasoline station on the morning of the WTC bombing. He maintained that the government witness who had testified to Abouhalima's presence at the station had fabricated the story, and opined that the government must have paid him for his testimony.
>
> He noted that the van could not have been at the gasoline station on the morning of the bombing, because it had been taken to Brooklyn, New York, on the evening that it was actually reported stolen . . .

Yousef Stmt. at 7.

Abouhalima argues that Yousef's statement constitutes newly discovered evidence that refutes Moosh's testimony.[58] Specifically, Abouhalima claims that:

> [T]he Yousef statement has the van at the hotel overnight until it was driven into the World Trade Center from the hotel during the day. The Moosh incident was supposed to have occurred at night, at 4:00 A.M. in New Jersey. It is inconsistent with the Yousef statement and irrational to claim that the defendants drove the van containing a massive bomb from Brooklyn to New Jersey to get gas in the middle of the night, and then back to the hotel in Brooklyn before it was driven into the World Trade Center.

Abouhalima's Memorandum in Reply to the Government's Memorandum in Opposition to Defendant's Supplemental Motions and Motion for Discovery at 9. Despite Abouhalima's contentions, Yousef's statement cannot give rise to a successful motion for a new trial under Rule 33 because the statement does not constitute evidence whose admission "would probably lead to an acquittal." *Locascio,* 6 F.3d at 949.

■ First, Yousef's statement would not have been admitted into evidence, and thus, could not have had any effect on the outcome of the trial. While Abouhalima goes to great lengths in arguing that exceptions to the hearsay rule provide for admission of the statement, he fails to realize that all exceptions to the hearsay rule are "to be applied in a commonsense manner, subject to the district court's sound exercise of discretion in determining whether the hearsay document offered in evidence has sufficient independent indicia of reliability to justify its admission." *Reynolds v. Giuliani,* No. 98 Civ.

---

**57.** Notwithstanding the fact that portions of Yousef's statement necessary to my decision are excerpted here, I note that both Yousef's and Ismoil's statements themselves remain subject to non-dissemination orders.

**58.** While Abouhalima also points to Eyad Ismoil's post-arrest statement, Ismoil's statement contains no mention of Abouhalima, nor of the whereabouts of the van in the early morning hours before the bombing. Insofar as Abouhalima relies on Ismoil's statement in support of his claims of "inconsistency" in the government's theories in the two World Trade Center trials, that argument is addressed *infra* at 103–05.

8877(WHP), 1999 WL 33027 (S.D.N.Y. Jan. 21, 1999) (quoting *City of New York v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981)). Insofar as Yousef's statement seeks to exculpate his co-conspirators, it clearly lacks such indicia of reliability—a finding made previously during the *Abdel Rahman* trial.

In *Abdel Rahman*, the defendants moved for a mistrial based on alleged *Brady* violations arising from the government's failure to provide the Yousef statement to the defendants. Judge Mukasey denied the motion, in part because he found that the statement was unreliable.[59] *Abdel Rahman* Tr. at 12,432, 12,-469. Judge Mukasey's concerns are compounded here by Yousef's blatant attempts elsewhere in the statement to exculpate Abouhalima by "shielding" him in his recounting of events.[60]

These factors would likely result in a finding that Yousef's statement is inadmissible, and Abouhalima's motion could be denied on that basis alone.[61] *See United States v. Stromberg*, 179 F.Supp. 278, 279–80 (S.D.N.Y.1959) (defendant's motion for a new trial based on newly discovered evidence must be denied because newly discovered evidence was not admissible, and thus, could not possibly produce a different result at a new trial).

Even assuming that Abouhalima could clear the admissibility hurdle, he would still face the fact that Yousef's statement contains several inculpatory references to Abouhalima's role in the bombing. Abouhalima attempts to defuse this issue by arguing that he is only offering the portions of the statement favorable to his argument. The rule of completeness, however, would allow the government to introduce the balance of the statement—including the inculpatory material. *See* Fed. R.Evid. 106. *See also Phoenix Associates III v. Stone*, 60 F.3d 95, 102 (2d Cir.1995). Taken as a whole, Yousef's statement certainly would not have lead to Abouhalima's acquittal, and in fact, would likely have bolstered the government's case against Abouhalima.

Moreover, even if the only portions of the statement that were admitted were those selected by Abouhalima—the portions excerpted above—those portions still would not constitute evidence that "would probably lead to an acquittal." *Locascio*, 6 F.3d at 949. Such an argument assumes that the jury would credit Yousef's statement—the statement of an avowed terrorist and mastermind of the World Trade

---

**59.** In commenting on the reliability of Yousef's statement, Judge Mukasey stated:

> a great deal of the material is in fact inculpatory rather than exculpatory, a good deal of it is contradictory internally, and a good deal of it reflects … that Mr. Yousef was withholding information, sometimes explicitly withholding it, and sometimes I think it is plain from other evidence that was available in this case and in the World Trade Center [case] that his information is in conflict with the facts.

*Abdel Rahman* Tr. at 12,469. Further evidence of the unreliability of Yousef's statement regarding Abouhalima's role in the bombing is discussed in Appendix B, filed herewith under seal.

**60.** For example, Yousef refuses to elaborate on Abouhalima's role in the bombing and attempts to explain away Abouhalima's presence at the bomb factory with the laughable contention that Abouhalima's presence was benign because others, including a telephone repairman, also visited the location. While Yousef's statement may contain some indicia of reliability insofar as it is against his own penal interest, blatant attempts at shielding such as these cast into doubt the reliability of all Yousef's attempts to exculpate his co-conspirators.

**61.** Earlier in this Opinion, I credited Yousef's statement with regard to the main charge of the World Trade Center bomb. Certainly Yousef's assertion that the main charge was urea nitrate contains ample indicia of reliability because it is entirely inculpatory and does not conflict with any evidence in this case. The portion of Yousef's statement at issue here is quite different. It seeks to exculpate co-conspirators and is at odds with in-court trial testimony that was subjected to cross-examination. As such, it cannot be deemed sufficiently reliable.

Center bombing—over the in-court testimony of Willie Moosh, an apparently unbiased eyewitness. That is an assumption that I am unwilling to make.

Even if the jury were to credit Yousef's testimony and accept as true his claim that the conspirators did not visit Moosh's Jersey City gas station in the early morning hours before the bombing, it still seems improbable that this evidence would lead to an acquittal in light of the enormous amount of evidence of Abouhalima's guilt independent of Moosh's testimony.

As a final note, Abouhalima's contention that the government somehow offered inconsistent theories at the two World Trade Center trials is patently frivolous. Abouhalima takes issue with evidence introduced by the government at the second World Trade Center trial that Ismoil took a hotel room in Brooklyn on the evening before the bombing and that his registration card from the hotel indicates that he checked in with a van.[62] Abouhalima claims that this fact somehow undermines Moosh's testimony in the first trial placing Abouhalima with the Ryder van at a Jersey City gas station at 4:00 a.m. the following morning—especially in light of additional evidence indicating that the conspirators drove the bomb-laden van from the hotel in Brooklyn to the World Trade Center just before noon on the day of the bombing.

Despite Abouhalima's contentions, the evidence adduced at the two trials concerning the movements of the Ryder van in the hours before the bombing is anything but contradictory. Taken as whole, the evidence indicates that the van was transported from the hotel in Brooklyn to Jersey City, New Jersey—a move presumably made so the conspirators could engage in last minute loading and fine tuning of the explosive device at the bomb factory in Jersey City—and then taken to a gas station also in Jersey City. The evidence further indicates that, after the van was filled with gasoline, it eventually returned to the Brooklyn hotel, presumably in order to pick up Ismoil, who then drove the van to the World Trade Center.[63]

Abouhalima does not provide any evidence as to how these events are in any way inconsistent.[64] Thus, it is clear that

**62.** As explained by Assistant United States Attorney Michael Garcia at the Hearing, the government became aware of Ismoil's hotel room in Brooklyn after the FBI obtained the phone records of an associate of Ismoil's in July 1994. The phone records listed a collect call from Brooklyn to the associate on the night before the bombing. The FBI traced the Brooklyn number to the hotel and then obtained a search warrant for the hotel. FBI Special Agent Brian Parr was among those who executed the warrant, and Parr obtained a guest card from the hotel listing Eyad Ismoil's name and his vehicle as a van. Upon obtaining the card, Parr placed his initials on it and the date it was obtained—July 14, 1994. Hearing Tr. at 102–03.

Abouhalima sought to call Parr at the Hearing in an attempt to determine when the government learned of Ismoil's hotel room in Brooklyn, or alternatively, "have some representation from the government about where that information came from and whether they did have it at the time of the Abouhalima trial". Abouhalima hoped to establish that the government had this information during Abouhalima's trial and improperly failed to provide it to trial counsel. In light of Parr's notation on the guest card and Garcia's explanation of the events preceding the discovery of the card, it is clear that there was no reason to hear from Parr because the guest card was not obtained until well after the jury's verdict in the first World Trade Center bombing trial.

**63.** In his statement, Ismoil contends that he was met at the hotel by the conspirators at approximately 9:00 a.m.—six hours after the time that Moosh claimed to have seen the Ryder van at the Jersey City gas station.

**64.** The only evidence that Abouhalima offers in support of his claim of inconsistency is an offer of expert testimony that:

a van packed with the explosives posited by the government was highly volatile and could explode upon jarring or careless handling, hence needless driving around in it on the night before the explosion was unlikely.

Abouhalima's Memorandum in Compliance with the Court's Orders at 12. Clearly this offer provides no support for Abouhalima's

neither Yousef's nor Ismoil's post-arrest statements provide any basis at all to support Abouhalima's motion for a new trial based on newly discovered evidence.

## B. Photographs of Abouhalima Revealing His Alleged Torture

Abouhalima also argues that the government withheld from the defense "original photographs" of Abouhalima taken after he was turned over to American law enforcement authorities. *See* Abouhalima Memorandum in Compliance at 20. Abouhalima claims that the photographs display "some of the wounds" from his alleged torture at the hands of Egyptian authorities, and thus, could have been used before and at trial in support of various motions to dismiss the indictment or suppress Abouhalima's post-arrest statements. *Id.*

Abouhalima's claims arise from two sets of photographs of Abouhalima taken by American law enforcement officials after the officials took him into custody in Egypt. The first set consists of five photographs that were taken aboard the airplane that returned Abouhalima to the United States (collectively, the "Airplane Photos"). In the first two of the Airplane Photos, Abouhalima is fully dressed, seated, blindfolded and handcuffed with his hands in front of him. In the next photo, Abouhalima is seen without the blindfold, seated and leaning across a table in discussion with an unidentified individual. There is an additional photo in which Abouhalima, again seated and without blindfold, appears to be blowing his nose. The final picture is, like the first three, of Abouhalima seated with the blindfold.

The second set of photos were taken after Abouhalima's arrival in New York, apparently at the Metropolitan Correctional Facility (collectively the "MCC Photos"). Abouhalima is nude in these photos, and close-up photographs of what appear to be wounds from his alleged torture are depicted.

Abouhalima's claims as to each set of photographs are equally specious, but factually distinct. Thus, each will be addressed separately.

### 1. The Airplane Photos

■ Abouhalima contends that neither copies nor originals of the Airplane Photos were provided to defense counsel until after trial, and as a result, the photos constitute newly discovered evidence that mandates a new trial. Not only is Abouhalima's claim that the government failed to turn over the Airplane Photos until after his trial incorrect, but even if it were correct, his claim would still fail.

As to the factual inaccuracies, Abouhalima's trial counsel was provided with the Airplane Photos during trial, not after trial, as Abouhalima suggests.[65] The Airplane Photos themselves were received into evidence as Abouhalima Exhibits C, D, E, F and G, and Abouhalima's trial counsel cross-examined NYPD Detective Louis Napoli concerning the photos. *See* Trial Tr. at 5979–80. Thus, insofar as Abouhalima's motion relies on the Airplane Photos, it must fail because it cannot even satisfy the first element of a newly discovered evidence claim—that the evidence

---

claim. First, it assumes that driving the van from Brooklyn to New Jersey was "needless". Abouhalima has come forward with no evidence to support that inference, and in fact, the evidence seems to indicate that taking the van to Jersey City was a necessary part of the preparations for the bombing. Second, no expert is needed to testify that handling, transporting and mixing volatile chemicals and explosives is dangerous business—that fact is self-evident. Nevertheless, that is exactly the type of activity in which the conspir-

ators engaged throughout the conspiracy. Thus, Abouhalima's claim that, on the eve of achieving the object of their conspiracy, the conspirators would have suddenly shied away from such hazardous activity is baseless.

65. Apparently, Abouhalima's confusion on this issue stems from the fact that at trial one of the prosecutors mistakenly represented that the Airplane Photos had been supplied to Abouhalima's defense counsel before trial. *See* Trial Tr. at 5979.

was discovered after trial. *See Locascio*, 6 F.3d at 949.

Moreover, even assuming that the photos were discovered after trial, Abouhalima's motion still would fail because the Airplane Photos do not constitute evidence whose admission "would probably lead to an acquittal." *Id.* Abouhalima argues that the photographs could have been used to "document the [alleged] torture and to contest the voluntariness of the statements taken aboard the airplane", and presumably serve as the basis for motions to dismiss the indictment or suppress Abouhalima's post-arrest statements. Abouhalima's Memorandum in Compliance at 20.

Despite Abouhalima's contentions, the Airplane Photos provide no evidence of torture or coercion. Abouhalima displays no injuries or other visible after-effects of torture, and aside from handcuffs and the occasional use of a blindfold—neither of which could be deemed coercive under the circumstances—there is absolutely no evidence of any coercion.

Moreover, even if the photographs did provide some evidence to corroborate Abouhalima's claims of torture, any motions made by Abouhalima based on such mistreatment would still have failed because of the lack of any evidence of American involvement in the alleged torture. *See supra* Part II(A).

## 2. The MCC Photos

█ Abouhalima's claim with regard to the MCC Photos is similarly lacking in merit. Here, Abouhalima's sole contention is that the government provided only black and white photocopies of the MCC Photos, and never provided originals or better quality photocopies.

In support of these claims, Abouhalima offered testimony of Jesse Berman, Esq. at the Hearing. Berman served as Abouhalima's defense attorney for approxi-

mately five weeks after Abouhalima arrived in the United States. Abouhalima also submitted an affirmation from Lawrence Vogelman, Esq., who replaced Berman as Abouhalima's defense attorney, but served for only a few days before being replaced by Abouhalima's trial counsel, Hassen Ibn Abdellah, Esq.

Both attorneys indicated that they were in possession of the black and white photocopies of the MCC Photos, but never received originals or duplicate originals. In addition, as revealed by a review of the file used by both attorneys, there is no evidence that either attorney requested better quality photocopies or original photographs from the government—a fact to which Abouhalima's counsel stipulated at the Hearing. *See* Hearing Tr. at 365.

As set forth above, it is clear that this argument cannot give rise to a cognizable newly discovered evidence claim because the original MCC Photos could have been discovered before or during trial with the exercise of due diligence. *Locascio*, 6 F.3d at 949.

Moreover, even if the original MCC Photos could not have been discovered through due diligence, Abouhalima's motion would still fail because, as with the Airplane Photos, there is absolutely no evidence whatsoever of American involvement in Abouhalima's alleged torture.

### *AJAJ'S MOTION*

In Ajaj's Rule 33 motion, brought through the assistance of his appellate counsel, Maranda Fritz, Esq., Ajaj claims that there are several areas of newly discovered evidence. He also claims that to the extent his trial counsel, Austin Campriello, Esq., failed to discover or use the alleged new evidence, he received ineffective assistance of counsel. At the Hearing on Ajaj's motion, Ajaj presented the testimony of Attorney Campriello[66] and the

---

**66.** In accusing Attorney Campriello of incompetence, Ajaj waived the attorney client privi-

lege with respect to their communications.

testimony of Mohammad Nabil Elmasry, an interpreter hired by Attorney Campriello to assist in his representation of Ajaj. Defendant Ajaj, given two opportunities to testify, intentionally failed to do so. A brief explanation is necessary.

Several times throughout the course of his incarceration for the World Trade Center bombing, Ajaj engaged in hunger strikes to protest conditions of his confinement. Presently, his health is not robust. Since his conviction, Ajaj was diagnosed with lung cancer and one of his lungs was surgically removed.

Upon Ajaj's relocation to the MCC in New York City for purposes of the Hearing, he engaged in a hunger strike to protest conditions he allegedly suffered in transit and at the MCC. Ajaj sought the intervention of the court and appeared before me at a conference on January 29, 1999. At the conference, Ms. Fritz argued that Ajaj had suffered through a series of events that caused him to engage in the hunger strike. She stated:

> [T]his is not something that he does on a whim or a fancy. It's not something he does because he's having a bad day. It's not something he does because he's in a bad mood.

Conf. Tr. at 5.

Because the law is clear that Ajaj did not have the absolute right to be present at the Hearing, I ordered that if Ajaj did not begin consumption of food the following day, he would be returned to the appropriate facility designated by the Bureau of Prisons and lose his privilege to be present. Conf. Tr. at 6. *See* Fed. R.Crim.P. 43. *See also Barber v. United States,* 142 F.2d 805, 806–7 (4th Cir.), *cert. denied,* 322 U.S. 741, 64 S.Ct. 1054, 88 L.Ed. 1574 (1944) (defendant's presence not required at post-conviction hearing on newly discovered evidence). After the conference, Ajaj agreed to end his hunger strike. *See United States v. Ayyad,* 93 Cr. 180, 1999 WL 38185 (January 29, 1999).

Ajaj was present, seemed healthy and was active in conversations with Ms. Fritz during the first week of testimony. When the court resumed the Hearing on Monday, March 1, 1999, however, Ajaj appeared in court in a wheelchair allegedly in a severely weakened condition from a weekend hunger strike. As Ajaj was well-aware throughout the weekend, Attorney Campriello was scheduled to testify that Monday morning. Ms. Fritz sought an adjournment claiming that, because Ajaj was the only other party to the conversations with Attorney Campriello, she needed him to be healthy and active to assist her in questioning. The request was denied and the Hearing commenced. Hearing Tr. at 391.

During Attorney Campriello's testimony, Ajaj's conduct was disruptive, and he was removed from the courtroom. After Attorney Campriello and Mr. Elmasry completed their testimony on Tuesday, March 2, 1999, Ms. Fritz informed the court that Ajaj might also want to testify. *Id.* at 708. Because Ms. Fritz asserted that due to Ajaj's condition from the hunger strike, he could not testify immediately, she was given leave to take a video deposition of Ajaj if she wanted to put any testimony from him on the record. The deadline for submission of the deposition was set for March 26, 1999. *Id.* at 709. The court was informed that despite the parties agreeing upon a specific date to take Ajaj's deposition, Ajaj continued in further hunger strikes. He was unable to proceed on the scheduled date and his video deposition was never submitted.

The burden of persuasion rests with Ajaj in this proceeding. I therefore examine the evidence set forth by Ajaj as it exists.[67]

---

67. The parties submitted letters to the court explaining the reasons behind Ajaj's failure to submit to a video deposition on the scheduled date and on any subsequent dates through March 26, 1999. Ms. Fritz' submissions place part of the blame for this failure on the government because the government informed Ms. Fritz on March 2, 1999 that it was

Ajaj argues that since his conviction, he has developed new evidence regarding: (1) his departure to Pakistan; (2) his activities in Pakistan; (3) his return to the United States; (4) the luggage he carried into the United States; (5) his contacts with Ramzi Yousef; and (6) the co-conspirators' lack of knowledge of Ajaj. Ajaj also argues that, to the extent the court finds that his trial counsel had an adequate opportunity to obtain or use evidence that could have been discovered before or during trial through the exercise of due diligence, trial counsel's failure to do so violated his right under the Sixth Amendment to effective assistance of counsel.

## I. *Alleged Newly Discovered Evidence Regarding Ajaj's Departure to Pakistan*

### A. Summary of the Evidence at Trial

The evidence at trial established that Ajaj initially entered the United States on September 9, 1991. After arriving in Houston, Texas, Ajaj filed a petition for political asylum. Instead of appearing at the hearing regarding his petition, Ajaj left the country under an assumed name, an action which resulted in the cancellation of his asylum application for lack of prosecution.[68]

When Ajaj left his apartment in Houston, Texas, he informed his landlord that he was moving to New York. His story was not completely true. While months later, Ajaj did go to New York, he first traveled to Peshawar, Pakistan on reservations

that, beginning April 18, 1992, he, Mohammad Abid and Ibrahim Sulaiman had made through TWA.

On the night of April 23, 1992, Ajaj called Omar Obaid and asked him for a ride to the Houston airport. Contrary to what he told his landlord, Ajaj told Obaid him that he was traveling to India as part of his leather business.

On April 24, 1992, Obaid drove Ajaj to the airport. He was asked by Ajaj to sell Ajaj's car and send Ajaj the money. Ajaj left Obaid a forwarding address in care of "El Jihad"[69] magazine in Peshawar, Pakistan and asked Obaid not to tell Ajaj's uncle that he had left the country.

### B. The Alleged Newly Discovered Evidence

#### 1. Ajaj's Work in University Services

Ms. Fritz first argues that new evidence establishes that, for many years prior to leaving the Middle East for Houston, Texas, Ajaj was in the business of providing university services to Palestinian students. In connection with that business, Ajaj innocently sought to travel from Texas to Pakistan to meet university administrators and obtain information regarding application processes and financial assistance.

Ms. Fritz claims that a long list of individuals could testify about Ajaj's university services business, activities and intentions in the Middle East: Mohammed Abu Khdair; Mahmoud Abu Khdair; Ali Sabra; Richard Bernstein; Abu Bassam; Mah-

---

unavailable from March 21 through March 26.

The blame for Ajaj's failure to testify can only be placed on Ajaj. There is sufficient evidence from the timing of Ajaj's hunger strikes to conclude that they are a tactic of manipulation. Contrary to Ms. Fritz' argument at the January 29, 1999 conference that Ajaj does not engage in self-destructive behavior on a "whim or a fancy", Attorney Campriello testified at the hearing that on one occasion, he and Ajaj discussed Ajaj's "suicide" attempt in prison:

Ajaj made it clear to me that that might happen from time to time but that I should

not worry about it. That those were not for real, that Islam forbade suicide and he would not really do it. That I should keep just working on the case and not let it deflect me.

Hearing Tr. at 441.

**68.** Ajaj failed to obtain what is known as "advance parole", a procedure which allows an asylum seeker to travel abroad and re-enter the United States without forfeiting a pending claim.

**69.** Translated, "Jihad" sometimes means "holy war".

288

moud Al–Bazayah; Hasan Mohammed Al–
Bazayah; Bilal Al–Heyary; Muhammed
Abid; Omar Obaid; and Ibrahim Sulai-
man. *See* Ajaj Memorandum at 48–9;
Fritz Affirmation in Support, Ex. 34, 35,
37, 46, 47, 48, 49, 50; Fritz Letter dated
Feb. 4, 1999.

 While other than Omar Obaid, the
individuals listed above did not testify at
trial, their proposed testimony would not
constitute newly discovered evidence.

 As an *initial matter*, as set forth in
their affidavits submitted as exhibits to
Ajaj's motion, the testimony of these wit-
nesses would have been based chiefly on
what Ajaj told them. Such testimony is
clearly hearsay and would not be admissi-
ble evidence.[70] *See* Fed.R.Evid. 801(c).

Even if their affidavits revealed admissi-
ble evidence, however, the two points be-
low demonstrate that the testimony from
these witnesses is not "new" evidence that
"would probably lead to an acquittal." *Lo-
cascio,* 6 F.3d at 949. First, the evidence
is not "newly discovered" because Attor-
ney Campriello testified at the Hearing
that he knew about Ajaj's university ser-
vices occupation before trial and investi-
gated Ajaj's background by discussing it
with Ajaj "on several occasions at great
length." Hearing Tr. at 454.

Second, and more importantly, evidence
of Ajaj's university services business was
actually presented at trial and did not lead
to an acquittal. The evidence was present-
ed in the form of recorded telephone con-
versations between Ajaj and Mohammed
Abu Khdair. Attorney Campriello argued
from this evidence that Ajaj's telephone
conversations with Mohammed Abu
Khdair from prison which, in part, refer-
enced his student services business, were
entirely innocent. Trial Tr. at 8837–39,
8911–12. Thus, any further testimony
from the witnesses listed above regarding
Ajaj's university services business would
clearly have been cumulative and cannot
be considered newly discovered.[71]

 From the above, it is also clear
that Attorney Campriello did not provide
constitutionally ineffective assistance of
counsel in failing to investigate further or
present further evidence on Ajaj's univer-
sity services business to the jury. Not-
withstanding the fact that there can be no
"prejudice" found to satisfy the second
prong of *Strickland* from the lack of pre-
sentation of the largely inadmissible and
cumulative evidence, Attorney Campriel-
lo's testimony showed that his decisions on
this issue were also "objectively reason-
able".

70. With the exception of Bassam and Abid, Ms. Fritz sought to call all of the witnesses listed above at Ajaj's hearing. *See* Fritz Letter dated Feb. 4, 1999. After a discussion on the record in which I noted the problem of their hearsay testimony, I ruled that "if after hear-ing Ajaj testify I figure that these people are necessary in some way to come in and testify, we'll take a chance on them". Hearing Tr. at 133. As noted above, however, Ajaj never testified.

71. Ms. Fritz claims to have newly discovered a letter dated April 10, 1992 from Ajaj to Mahmoud Abu Khdair which describes Ajaj's intentions with respect to his university ser-vices business in Pakistan. Fritz Affirmation in Support, Ex. 35. Notwithstanding the hearsay present in its text, even if the letter was unknown or could not have been discov-ered at the time of trial, the basis for letter— Ajaj's involvement in university services—was

known. Ajaj may have discovered the letter after trial, but he has failed to show that it would not have been cumulative of the evi-dence already considered and that, even if admissible, "would probably lead to an ac-quittal." *Locascio,* 6 F.3d at 949.

Ms. Fritz also claims to have newly discov-ered evidence about why Ajaj told Omar Obaid not to tell Ajaj's uncle that he was leaving Texas. Omar Obaid's affidavit states that "Ajaj mentioned that he did not want Omar to tell his uncles (sic) about his travel plans because they would tell Ajaj's mother, who was in ill health and would worry about him." Fritz Affirmation in Support, ¶ 89, Ex. 47, ¶ 8. Omar Obaid testified at trial, howev-er. Nothing he would have to say about what Ajaj told him or what he knew from Ajaj, therefore, can possibly be deemed "newly dis-covered" evidence. As Ms. Fritz is well aware, this information was available at the time of trial.

Attorney Campriello not only recognized that much of the testimony from these witnesses would be inadmissible hearsay,[72] but he also felt that since Ajaj's university services work was supported by other evidence presented at trial that could not be cross-examined, he already had sufficient material to argue in summation that Ajaj's trip to the Middle East was entirely innocent. Hearing Tr. at 457, 538; Trial Tr. at 8935.

■ One additional matter bears mentioning. Mohammed Abu Khdair, one of the witnesses listed above, is repeatedly referenced throughout Ajaj's papers as being able to offer newly discovered evidence which Attorney Campriello ineffectively failed to obtain. Attorney Campriello's testimony clarified not only what he knew about Mohammed Abu Khdair at the time of trial but also why he cannot be adjudged to have provided ineffective assistance of counsel in failing to call Abu Khdair as a witness.

Attorney Campriello spoke with Abu Khdair before trial, discovered that he had been debriefed by the FBI and sought to learn from Abu Khdair what he told the government. Hearing Tr. at 449, 452. Although Abu Khdair assured him that he had told the government nothing harmful, Ajaj had previously told Attorney Campriello that Abu Khdair was a "dear friend of his" who was "very, very stupid." *Id.* at 534, 535, 537.

Attorney Campriello also knew that while Ajaj was in prison for returning to the United States on a fraudulent passport in the months before the World Trade Center bombing, Abu Khdair used his telephone to assist Ajaj in communicating with Ramzi Yousef. *Id.* at 535. In fact, Abu Khdair's lawyer told Attorney Campriello that the government had subpoenaed Abu Khdair and that he was going to assert the Fifth Amendment privilege against self-

incrimination. *Id.* at 537; Fritz Affirmation in Support, Ex. 34.

Thus, while Attorney Campriello recognized "that there were things that we could call Mr. Abu Khdair to the stand for in this trial that were marginally helpful for Mr. Ajaj", he was concerned that Abu Khdair would be a dangerous witness. *Id.* at 535. Ajaj had told Attorney Campriello that "he would rather lose the trial than do anything to jeopardize Mr. Abu Khdair." *Id.* at 538.

## 2. Ajaj's Conflict with Militant Muslims

■ Ms. Fritz also argues that Ajaj could not have been departing for the Middle East for the sinister purposes the government suggested [73] because newly discovered evidence shows that his university services work "aroused the ire of" and caused him to be "harassed and targeted by militant Muslim groups, including Hamas." Ajaj Memorandum at 36.

Because this evidence was known at the time of trial, however, it cannot be considered newly discovered. Attorney Campriello testified that Ajaj told him that "one group or two separate groups . . . issued a death warrant for him because of his activities in student services and . . . this group or these groups did not want Palestinian youth to leave the country, in order to get better educated, but wanted them there as a basis, for . . . [i]nfatadah" (sic).[74] Hearing Tr. at 541–2.

Attorney Campriello's testimony further enlightens us as why his failure to call attention to this evidence cannot be considered ineffective assistance of counsel.

[Ajaj] and I discussed whether or not and the extent to which [this issue] could be used to help him in [the] trial . . . And I had several problems with that . . . One problem was that . . . the fact that group X wanted to kill Mr. Ajaj did

---

72. Hearing Tr. at 543, 546.

73. *See infra* Part II(A)–(B).

74. Translated, "intafadah" means uprising and generally refers to the Palestinian uprising against Israel.

not necessarily mean he wasn't a member of group Y ... Secondly, ... I didn't want to import things about various terrorist organizations into this trial ... In addition, Mr. Ajaj was very ambivalent about this because Mr. Ajaj explained to me that we didn't want to be too critical of any of these organizations because at any given moment some of these folks could be in control of the neighborhood where he had relatives and if we went in this direction, we would have to tread very lightly to begin with, lest we offend the wrong people and there be repercussions to his family back in Jerusalem.

*Id.* at 634–36.

Attorney Campriello's decision, based on this discussion, was obviously entirely thoughtful, intelligent and competent and should not be second-guessed on this motion.

### 3. Ajaj's Departure to Pakistan

Ajaj also argues that he has discovered new evidence about his departure to Pakistan.[75] Although the government proved that Ajaj reserved tickets to Pakistan with Mohammad Abid, Abid has filed an affidavit stating that Ajaj obtained his ticket to Pakistan when Abid canceled his own trip to Pakistan and posted a note on a bulletin board. Ajaj contacted Abid in response to the note and bought his ticket. Fritz Affirmation in Support, Ex. 46.

 This evidence is most obviously not new and certainly not a basis to find ineffective assistance of counsel. If these are indeed the true events of Ajaj's receipt of his ticket to Pakistan, Ajaj was well aware of this information before and during the time of trial. If he kept this information from his attorney, his attorney cannot be held incompetent for failing to discover it. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

Additionally, Attorney Campriello made clear at the Hearing that his strategy on the entire issue of Ajaj's departure was reasonable and within competent professional norms. Attorney Campriello testified:

I did not want to focus any attention on Mr. Ajaj's trip out of the country ... Mr. Ajaj went out of the country illegally. That's a problem. He went out of the country under somebody else's name. That's a problem. He did it precipitously. That's a problem ... [I]t seemed to me that that supported [the government's] theory as to where he was going, as to why he did not want people to know where he was going, and so, contrary to the defense I think Ms. Fritz suggests might have been efficacious, I did not, as a conscious decision, want to focus any attention to how he left the country.

Hearing Tr. at 614–15.

### II. *Alleged Newly Discovered Evidence Regarding Ajaj's Activities in Pakistan*

#### A. Summary of the Evidence at Trial

After Ajaj arrived in Peshawar, Pakistan in April 1992, the entry and exit stamps in his passport indicated that he traveled through several countries in the Middle East, including Saudi Arabia. According to Ajaj's Pakistan Certificate of Registration, Ajaj returned to the Peshawar region on or about June 14, 1992.

On July 1, 1992, Ajaj visited the consulate section at the United States embassy in Islamabad, Pakistan. Ajaj claimed that he had only been in Pakistan for a few weeks and that he was employed at the Islamic University in Islamabad. Karen Stanton, a United States embassy official, told him that the Islamabad office could not help him return to the United States

---

**75.** Once again, the April 10, 1992 letter is deemed important to this issue. *But see supra* note 71.

because when he left the United States, he had not obtained advance parole.[76]

Instead of going to the American Embassy in New Delhi, India as he was instructed, Ajaj and Ramzi Yousef, with whom he had made contact in the Middle East, created false identities for themselves in the names of "Khurram Khan" and "Azan Mohammad". They collected and created false records to support their false identities and jointly prepared to enter the United States illegally. They made their travel arrangements together, provided the Ghandara Travel agency with a single contact telephone number for both of them and traveled together in adjacent seats in first class from Peshawar to Karachi on August 31, 1992. At Karachi, Ajaj and Yousef entered the connecting airplane separately and sat separately in first class for the final leg of their trip to New York.

At Kennedy Airport, upon discovering that Ajaj was using an altered passport, his bags were inspected. Among the items found in Ajaj's luggage was a "Letter of Introduction" to a terrorist training camp known as Camp Khaldan.

## B. The Alleged Newly Discovered Evidence

■ Attorney Fritz argues that newly discovered evidence establishes that, contrary to the government's argument at trial that Ajaj traveled through the Middle East to obtain the "Letter of Introduction" to the terrorist training camp, no such travel occurred. She argues that Ajaj spent the summer of 1992 researching universities in Pakistan.

## 1. Witnesses Regarding Ajaj's Work in University Services

The discussion above in Part I(B)(1) details my reasoning with respect to this proposed evidence. Any information that witnesses in the Middle East could provide about Ajaj's university services business can be considered neither "newly discovered" nor a basis for a finding of ineffective assistance of counsel.

Because Ms. Fritz highlights the proposed testimony of four witnesses for this claim, however, further discussion is necessary. *See* Ajaj Memorandum at 48–50. Allegedly, Abu Bassam would testify that he met Ajaj in Pakistan and that they traveled together to the university in Islamabad. Mahmoud Al–Bazayah would testify that he met Ajaj at the Azzam house in Peshawar, Pakistan in May, 1992. New York Times reporter Richard Bernstein would confirm that the Azzam house is frequented by students. Finally, Sulaiman Al Khawaldah would testify that he met Ajaj during the summer of 1992 in Peshawar.[77] Fritz Affirmation in Support, Ex. 49.

Attorney Campriello's testimony sheds some further light on the competent, professional and effective counsel he provided with respect to the proposed testimony of these witnesses. First, Attorney Campriello testified at the hearing:

> I explained to [Ajaj] that I did not think that it did [him] a great deal of good if [he could] account for some of his time in Pakistan, but not all of his time. . . . I told him [that I] was really interested . . . if there was a person who could say that, "I was with Ajaj in Pakistan from the day he landed until the day he left, and that throughout that entire period

76. *See supra* note 68.

77. Sulaiman was tried and convicted of perjury before a jury on January 28, 1998. *United States v. Sulaiman,* 96 Cr. 133(WK). According to Attorney Campriello, he knew about Sulaiman and discussed with Ajaj the possibility of calling him as a witness at trial. "Mr. Ajaj did not want me to go near Mr.

Suliman (sic). One reason why I believe Mr. Ajaj did not want me to go near Mr. Suliman (sic) was Mr. Ajaj told me that Mr. Suliman (sic) went every year to Afghanistan to fight Russians sort of the way you and I would go on vacation. . . . Mr. Ajaj had no interest in getting Mr. Suliman (sic) involved in this case." Hearing Tr. at 613.

of time never once did he go to Afghanistan, never once did he go to a training camp, and here is what he and I did together during that time."

Hearing Tr. at 603.

Second, Attorney Campriello testified:

I don't believe [Ajaj] ever gave me the name of any human being that he visited at any university . . . Ajaj told me about Islamabad . . . and I know that [Ajaj] told me he went to Afghanistan. Beyond that I don't know where else he went, if anywhere else, in Pakistan.

*Id.* at 687–88.

Third, Attorney Campriello recognized from conversations with Ajaj that while the Azzam House in which he did stay in Peshawar was in part a guest house, Attorney Campriello "thought of it as a place where you could stay while you were waiting to get admitted into the camp in Afghanistan." *Id.* at 547. As such, he didn't want to draw any further attention to issues regarding the Azzam House.

Finally, Attorney Campriello recognized that the Letter of Introduction to the terrorist training camp found in Ajaj's luggage referenced an "Abu Malek". Attorney Campriello understood from his communications with Ajaj that Ajaj was Abu Malek and thus, in fact, had been in the terrorist training camp. He actually confronted Ajaj with the fact that he thought he was Abu Malek. When Ajaj smiled, "that confirmed for [Attorney Campriello] that [Ajaj] in fact had been in the camp." *Id.* at 608. Because Attorney Campriello didn't think that the government was aware of this at the time of trial he was pleased to keep the issue quiet.[78] *Id.* at 609.

As such, despite what Ms. Fritz claims the four witnesses noted above would testify to, all of this information was either known or discoverable at or before the

time of trial. In any event, even if it was not known or discovered, Attorney Campriello's testimony makes clear that he would not have sought to use the information. His decision cannot be viewed as objectively unreasonable.

#### 2. The Stamps in Ajaj's Passport

The government utilized Ajaj's passport, and the many stamps therein, to argue that he traveled through the Middle East for the purpose of procuring the Letter of Introduction to the terrorist training camp. Because those passport stamps have been shown to be false, Ms. Fritz argues that they are not evidence of travel at all.

Once again, none of this evidence can be considered newly discovered. As an initial matter, it is clear from the trial transcript that Attorney Campriello was aware of and argued the unreliability of the passport stamps at the time of trial. He argued in summation that the government's translation of the passport displayed discrepancies in the stamps which made the passport unreliable as a travel document. Trial Tr. at 8885–86. Further, Attorney Campriello made clear at the post-trial hearing that he and Ajaj "discussed how the stamps got into his passport," and that "Ajaj told [him they] were phony stamps." Hearing Tr. at 606.

Additionally, it is the law of the case that even if there is newly discovered evidence regarding false passport stamps, the interests of justice would not demand a new trial. *Salameh*, 152 F.3d at 160 n. 24. As the Second Circuit recognized in affirming Ajaj's conviction, even if there were false stamps in the passport, "these irregularities would not have undermined the reliability of the passport as a whole." *Id.* at 138. There was sufficient corroborative evidence for the government to

---

78. All four defendants initially tried in this case decided to exercise their right to a speedy trial. Attorney Campriello testified that this did not impair his defense. Hearing Tr. at 460. Further, he testified that the gov-

ernment's apparent ignorance at trial that Ajaj was Abu Malek was evidence that "the fact that we went to trial quickly hurt the government far more than it hurt the defense." *Id.* at 609.

"rely on Ajaj's passport as a travel document." [79] *Id.*

██ There is similarly no basis to find that Attorney Campriello provided ineffective assistance of counsel on this issue. Not only did he actually make use of the inauthenticity of the stamps in his closing argument, but as he testified at the Hearing, he was bound by the information given to him by his client. He testified that although he knew from Ajaj that the passport stamps were phony, "[i]n [his] dealings with Mr. Ajaj [he] never got a set chronology [of his travel]." *Id.* at 604. Ajaj never informed Attorney Campriello of a witness or witnesses who could say that they were "with Ajaj in Pakistan from the day he landed until the day he left, and that throughout that entire period of time never once did he go to Afghanistan, never once did he go to a training camp". *Id.* at 603.[80]

### 3. Ajaj's Alleged Innocent Efforts to Return to the United States

Ms. Fritz argues that there is new evidence about Ajaj's efforts to return to the United States. First, an affidavit from Mahmoud Al–Bazayah claims that although Karen Stanton told Ajaj to go to New Delhi, India, Mahmoud Al–Bazayah warned Ajaj against doing so "because of the suspense between India and Pakistan about Cashmere (sic), and because the Indian government had arrested many Arabs coming from Pakistan". Fritz Affirmation in Support, Ex. 50. Ms. Fritz argues that because of this warning, Ajaj was forced to obtain the fraudulent Swedish passport.

██ This evidence cannot be considered newly discovered. Not only was it known to Ajaj at the time of trial, but it is immaterial to Ajaj's case. If anything, it bolsters the government's evidence that instead of doing what Karen Stanton recommended, Ajaj joined Yousef and obtained a false identification. Clearly, it cannot possibly be said to be of such force that it "would probably lead to an acquittal." *Locascio*, 6 F.3d at 949.

Ms. Fritz also claims that there is new evidence about how Ajaj was able to afford a first class ticket to the United States. Namely, contrary to the government's insinuation that Ajaj was financed by a terrorist organization, new evidence shows that Mohammed Abu Khdair sent Ajaj a cashier's check for $1100 from Texas. Fritz Affirmation in Support, Ex. 34. Additionally, the affidavit of Shafqat Durrani, filed April 13, 1995, states that at the time Ajaj flew back to the United States, flights were generally filled to capacity. Fritz Affirmation in Support, Ex. 55. Ajaj was therefore forced to travel first class because it would have been difficult to purchase a ticket in coach.[81]

79. At Ajaj's hearing, Ms. Fritz sought to call a witness from each of the Consulate General of Pakistan, the Embassy of United Arab Emirates, the Mission of Jordan and the Mission of Kuwait to testify that their respective stamps found in Ajaj's passport were false. *See* Fritz Letter dated Feb. 4, 1999. In light of Attorney Campriello's closing argument and the Second Circuit's opinion, there was absolutely no reason to seek to call these witnesses to testify at the Hearing.

80. Ms. Fritz also argues that there is new evidence that Ramzi Yousef was carrying a passport with a false Pakistani stamp and that because of this new evidence, the government's argument at trial that Ajaj's travel correlated with Yousef's now "appears to have been baseless." Ajaj Memorandum at 53. It is Ms. Fritz' argument that is baseless.

There was overwhelming and compelling evidence introduced at trial that Ajaj traveled with Ramzi Yousef. Thus, to the extent there is any new evidence about a false stamp in the passport of Ramzi Yousef, it does not have such force as to require an entire retrial and cannot be viewed as evidence that "would probably lead to an acquittal." *Locascio*, 6 F.3d at 949.

81. Ms. Fritz also argues that there is new evidence that Ajaj intended to return to Texas. Her argument, however, is based on information that was already available to the defense and even utilized by the government at trial. It is not new evidence. Ajaj Memorandum at 56. The government's evidence made it clear that, whatever Ajaj's eventual intentions were, he made an airline reservation in Pakistan

All of this evidence could have been discovered before or during the time of trial and cannot be considered new. Even if it were discovered and utilized, it is of insufficient force as to require a new trial. Irrespective of the source of Ajaj's funds and the location of his seat on an airplane back to the United States, the evidence introduced at trial conclusively established that he traveled to and arrived in the United States as a member of this conspiracy. How he was able to afford his first class ticket was, at best, a collateral matter.

In light of the above, I also find that there is no basis upon which to conclude that Attorney Campriello's failure to discover or use minimally relevant evidence constituted ineffective assistance of counsel.

## III. *Alleged Newly Discovered Evidence Regarding Ajaj's Return to the United States*

### A. Summary of the Evidence at Trial

Ajaj had checked all of the luggage in the second leg of his journey to the United States under the name, Khurram Khan. When his luggage was searched at Kennedy Airport, INS officials found more than the Letter of Introduction to the terrorist camp. Inside Ajaj's luggage, they discovered multiple pieces of identification, including not only both the Khurram Khan and Azan Mohammed passports and tickets, but also false documents created to support the Khurram Khan and Azan Mohammed identities. In addition, INS officials found six printed bomb-making manuals and some handwritten notebooks containing notes on the construction of improvised explosive devices.[82]

Ajaj became belligerent upon the officials' discovery of the material, and he was detained. Noticing that Ajaj was carrying

the Azan Mohammed passport and ticket, INS Inspector Robert Malafronte asked Ajaj if he was traveling with anyone else. Ajaj replied that he was traveling alone.

When the INS officials noticed the photo substitution on Ajaj's passport, however, he was arrested and charged with passport fraud by the United States Attorney's Office in the Eastern District of New York. Upon a plea of guilty, Ajaj was sentenced to six months in prison.

Unlike Ajaj, Ramzi Yousef entered the United States relatively smoothly by producing an Iraqi passport and claiming political asylum. While Yousef also claimed to be traveling alone, unlike Ajaj, Yousef's luggage contained no patently incriminating material. The one bag he was carrying contained only clothing. When asked by INS officials for a contact address in the United States, Yousef provided a Houston address and telephone number that he had listed on a small notepad as belonging to a "friend of Abu Malik". The telephone number belonged to Ajaj's friend, Mohammed Abu Khdair.

From this evidence, the government argued in summation that Ajaj deflected the INS's attention away from Yousef at Kennedy Airport and facilitated Yousef's entry into the United States.

### B. The Alleged Newly Discovered Evidence

■ Ms. Fritz argues that there is new evidence regarding Ajaj's return to the United States—new evidence to refute the government's "surprise" argument in summation that Ajaj diverted the INS's attention from Yousef. Allegedly, neither Mark Cozine nor Martha Morales, two INS officials who testified on April 18, 1995 in the *Abdel Rahman* trial, had knowledge that Ajaj provided a distraction for Yousef or

---

only so far as New York City. He did not book a flight through to Houston.

**82.** Also inside Ajaj's luggage were several instructional videotapes on making explosives.

One demonstrative example in the videotape depicted a van exploding and destroying a United States embassy.

that the co-conspirators' travel was correlated. Allegedly, they could testify that Ajaj and Yousef were processed in entirely separate areas at Kennedy Airport and that Yousef's processing was nearly complete before Ajaj's case was initiated. *See* Ajaj Memorandum at 57–9: Fritz Affirmation in Support, Ex. 58, 59.

This evidence, however, is also not newly discovered. Both Cozine and Morales actually testified at Ajaj's trial. As such, any information they had or knew about the events at Kennedy Airport was readily available for discovery by the defense at the time of trial. In any event, whatever Cozine and Morales could state as to what they knew at the time that Ajaj and Yousef entered the United States is entirely irrelevant. Nobody from the United States authorities knew that at the time Ajaj and Yousef entered the United States, they were co-conspirators. Unfortunately, this information did not become clear until after the bombing of the World Trade Center.

Moreover, regardless of what Cozine and Morales would now say, it is clear that the government's argument that Ajaj facilitated Yousef's entry into the United States at Kennedy Airport was not a surprise at all but was, as the Court of Appeals found, "based squarely on the evidence".[83] *Salameh,* 152 F.3d at 138.

In light of the above, Attorney Campriello's performance cannot be adjudged incompetent for failing to elicit such testimony from Cozine and Morales. The opinion of the Second Circuit affirming Ajaj's conviction makes clear that this proposed "new" testimony would in no way have altered the result of the proceeding. The government still would have been able to suggest the same "reasonable inferences to the jury" regarding Ajaj's and Yousef's entry into the United States. *Id.*

## IV. *Alleged Newly Discovered Evidence Regarding The Luggage Ajaj Carried into the United States*

### A. Summary of the Evidence at Trial

As noted above, the incriminating material in the luggage Ajaj was carrying at Kennedy Airport included the Letter of Introduction to the terrorist training camp, the "terrorist" videotapes and the bomb-making manuals and notebooks. Numerous fingerprints found in the books and notebooks seized from Ajaj matched those of Ajaj and Yousef. Carol Edelen testified as the government's fingerprint expert as to the alignment of Ajaj's fingerprints on one of the notebooks containing bomb-making instructions—Government Exhibit 2805—which testimony the government later argued indicated that Ajaj might have actually written that notebook.

### B. The Alleged Newly Discovered Evidence

Ms. Fritz claims that newly discovered evidence demonstrates that the incriminating material in Ajaj's luggage was the property of a known military activist named Yasin Bazayah. When Yasin Bazayah died, Ajaj was asked to carry his belongings to the United States and, due to the poor postal system in Pakistan, mail them from this country to Bazayah's family in the Middle East.

Accordingly, at the Hearing, Ms. Fritz sought to call witnesses to testify about Yasin Bazayah's military background and the custom in Pakistan to carry belongings for others. She argued that this information would supplement and support exculpatory evidence already available at trial where Ajaj made reference in a recorded telephone conversation from prison that it was a mistake for him to carry the belongings of others.[84] Ajaj Memorandum at 60.

---

83. Thus, because there was absolutely no reason for Cozine or Morales to testify at the Hearing, Ms. Fritz' request to call them as witnesses was denied.

84. In a recorded conversation from prison on January 28, 1993, nearly a month before the bomb went off in the World Trade Center, Ajaj said:

Significantly, Ms. Fritz also argues that newly discovered evidence in the form of expert testimony conclusively shows that Exhibit 2805 does not contain Ajaj's handwriting. As a result, she argues that Attorney Campriello provided ineffective assistance of counsel in failing to retain handwriting experts to discover it.

This particular issue received a significant amount of public attention when on October 17, 1994, the New York Times published an article written by Richard Bernstein raising questions about the validity of the evidence against Ajaj. Apparently, Mr. Bernstein received purported handwriting exemplars from Ajaj and gave them to two handwriting experts: Charles Hamilton and Abdel Fattah Riad. Upon comparing the exemplars to, in particular, **copies** of Government Exhibit 2805, the experts concluded that Ajaj's handwriting did not appear on the Exhibit.

### 1. Yasin Bazayah's Alleged Ownership of the Incriminating Materials

Ms. Fritz sought to call several witnesses to testify about Yasin Bazayah's military background and the custom in the Middle East to carry the belongings of others: Richard Bernstein; Ali Sabra, a Jordanian attorney who spoke with Yasin Bazayah's family; Omar Obaid who already testified at trial and specifically called attention to the Middle East custom; Sulaiman;[85] Mahmoud Al–Bazayah; and Mohammed Abu Khdair.

■ To the extent these witnesses could provide any evidence that would not be considered hearsay, it is clear that their testimony cannot be considered newly discovered. The fact that Ajaj was carrying some of the belongings of others was known at the time of trial. Attorney Campriello testified that "Ajaj did tell [him] early on .. that some of the material in his luggage belonged to [Yasin Bazayah]." Hearing Tr. at 474. Also, Omar Obaid's testimony at trial already noted that it was customary in the Middle East to carry the belongings of others. Any further testimony on this issue from any of the other witnesses noted above would have been, at best, cumulative.

■ It is also clear that Ajaj did not receive ineffective assistance of counsel through any failure on the part of Attorney Campriello to find or present this evidence at trial. Attorney Campriello's testimony at the Hearing revealed an entirely cogent and intelligent defense strategy that should not be second-guessed.

As he testified, Attorney Campriello felt that (1) it did not matter to whom the material belonged if it was used improperly; (2) the contents of the luggage itself (i.e. unopened envelopes) already conclusively demonstrated in a way that could not be cross-examined that Ajaj was carrying the belongings of another; and (3) tape recorded conversations of Ajaj from prison already indicated that Ajaj regretted carrying the belongings of another. Hearing Tr. at 475; *See also supra* note 85. Thus, while Attorney Campriello "was prepared to argue that [Ajaj] was carrying other people's things, ... [he] question[ed] how far [he should] go in that direction." *Id.* at 583. In the end, he "was very concerned

By God our Lord's mercy is good, praise the Lord. I mean I very much want to warn you of a few things. The first thing is not to accept to carry anything for anyone else, whatever it is, even if it was [unintelligible] you know what. There is one among us here whose brother in law, Muhammed, sent with him a package and poor guy was given 10 to 15 years.

I note that, although one could interpret Ajaj's statement as exculpatory in light of other evidence in the case that he was carrying some of the belongings of another individual, one could also interpret Ajaj's statement to mean that he regretted carrying the bombing manuals and false identifications into the country for Yousef while Yousef came into the country carrying only clothes. Indeed, Attorney Campriello testified that in his dealings with Ajaj, Ajaj's story about both his contacts with Ramzi Yousef and whether Yousef had any material in Ajaj's luggage changed over time. Hearing Tr. at 585–6.

85. *See supra* notes 77–8.

about cross-examination." Hearing Tr. at 583.

### 2. The Handwriting on the Bomb Manuals Allegedly Did Not Belong to Ajaj

■ The discussion below demonstrates that much like the other arguments raised above, there is no legal merit to the allegation that there is newly discovered evidence that Ajaj did not write Exhibit 2805. It similarly reveals that there is no legal merit to the claim that Attorney Campriello provided ineffective assistance of counsel in failing to retain handwriting experts or otherwise effectively challenge Carol Edelen's trial testimony as the government's fingerprint expert.

Unlike the other arguments raised above, however, there is no factual or legal basis whatever for this argument. That is so abundantly clear, and Ms. Fritz has nevertheless been so aggressively tenacious in pursuing her unfounded claim against Attorney Campriello, that her conduct raises ethical issues possibly worthy of examination in another forum.

To quote Ms. Fritz herself, "one of the absolute precepts of the law that relates to ineffective assistance is the concept that one cannot make reasonable strategic decisions with respect to a trial presentation unless one has conducted an appropriate pre[trial] investigation." Hearing Tr. at 124. Attorney Campriello's testimony elicited on direct examination by Ms. Fritz herself showed that Attorney Campriello did indeed conduct an appropriate investigation into the handwriting on Exhibit 2805, and that she knew it before she advanced this claim in Ajaj's motion.

### a. The Argument Lacks Legal Merit

From the outset, it has never been clear that the exemplars Mr. Bernstein received from Ajaj are evidence at all. In Mr. Bernstein's October 17, 1994 article, he stated that "the handwriting in the notebook differs substantially from a known sample of Mr. Ajaj's handwriting, notes that he wrote in the margins of one of the trial documents." Richard Bernstein, *Questions Raised in One Conviction in Blast at Towers: Interviews and Writing Samples Support Some Defense Claims,* N.Y.Times, Oct. 17, 1994 at B4. The article, however, does not state that Mr. Bernstein saw Ajaj write the "known sample". Accordingly, handwriting experts Charles Hamilton and Abdel Fattah Riad could at best testify that an unknown person's handwriting does not match up with the handwriting on a copy of Exhibit 2805. Such testimony, while convincing to Mr. Bernstein and the New York Times—and apparently Ms. Fritz—is entirely unimpressive in a court of law.[86]

■ Without Ajaj's testimony that he wrote the exemplars he gave to Mr. Bernstein or without a witness to the entire operation, the evidence lacks a foundation and would be inadmissible at trial. Inadmissible at trial, it cannot possibly be said that this alleged new evidence "would probably lead to an acquittal."[87] *Locascio,* 6 F.3d at 949.

---

**86.** Prior to the commencement of the Hearing, the following exchange occurred:

Ms. Fritz: Your honor, the circumstances under which Mr. Bernstein got those exemplars involved all of us sitting in a room in Florence, Colorado, with writing being done at the time, writing being provided, Mr. Bernstein. I don't think—

The Court: You and Bernstein were in a room and you and Bernstein can testify you saw Ajaj write each and every one of those pages?

Ms. Fritz: There was writing being done and there was writing that was provided prior. Your Honor, this man did not simply run off to the Middle East—

The Court: That's not what you said. You are the one who said that Ajaj took out a bunch of papers and said, here's my handwriting.

Ms. Fritz: Your Honor, those exemplars that were provided at the same time as Mr. Bernstein sat—

The Court: I assume that Mr. Ajaj is going to testify that that's his handwriting. Maybe then you'll have a basis for this.

Hearing Tr. at 138–39. *See also supra* at 286, n. 67 (Ajaj's failure to exercise two opportunities to testify).

**87.** In any event, whether Ajaj wrote the manual certainly was not determinative of his guilt. What was important was his posses-

Whether Ajaj did or did not write Exhibit 2805, this was information that quite obviously was known to Ajaj all along. However, it is unnecessary to look further than the testimony of Attorney Campriello to learn the truth. As he testified, in July 1993, Attorney Campriello asked for and received the court's permission in writing to hire a handwriting expert. He never hired the expert, though, because **Ajaj told him that he wrote both Exhibit 2805 and Exhibit 2814.** Hearing Tr. at 496–97. Attorney Campriello dictated this information onto a tape as he sat with Ajaj. *Id.* at 496–97.

In light of what he knew, Attorney Campriello cannot be adjudged to have provided ineffective assistance of counsel for failing to hire a handwriting expert who, if called to testify, would incriminate his own client. In Attorney Campriello's calculation, it would have hurt Ajaj if they demonstrated through handwriting experts that he did not write some incriminating material in his luggage but left out of the analysis of other incriminating material. *Id.* at 498. In addition, Attorney Campriello felt that because the government did not give notice that they were going to use a handwriting expert, in light of the information he received from Ajaj, he did not want to alert them by hiring an expert for only some of the documents in the luggage. *Id.*

Attorney Campriello's performance also cannot be challenged for failing to effec-

tively attack the credibility of Carol Edelen's testimony. In his summation, Attorney Campriello did exactly that. He challenged the government's reliance on fingerprint evidence to assert authorship and reminded the jury that the government had failed to obtain the testimony of a handwriting expert.[88] The charge of ineffective assistance of counsel is belied by his having done at the trial what Ms. Fritz alleges he failed to do.

**b. Defense Counsel Has Knowingly Advanced a Frivolous Claim and Made False Representations to the Court Pertaining to Trial Counsel's Conduct**

Ms. Fritz was appointed as counsel for Ajaj on appeal in April 1994. Shortly thereafter, she spoke to Attorney Campriello, who testified with respect to Ajaj's handwriting on Exhibit 2805 as follows:

> I said to Ms. Fritz, ... I think he told me he wrote that: in fact, I know he told me he wrote that, and I think that it's in an inventory that you have. And Ms. Fritz told me either that she had seen it or that a paralegal working with her, somebody had seen it she thought, and she told me that she would have it got. I was very concerned at that point because I couldn't find mine, and I thought that the only copy of it was with Ms. Fritz.
>
> Ms. Fritz did find it and Ms. Fritz called me back, and I said to her, Mar-

---

sion of the manual with the intent to use it to carry out the objects of the conspiracy.

88. Ms. Fritz sought to call Carol Edelen as a witness at the Hearing. Ms. Fritz argued that Ms. Edelen would testify that she was somehow pressured by the government to offer her testimony about the possibility of Ajaj's authorship of the bombing manuals at trial. She bases this argument on the report of Dr. Frederic Whitehurst suggesting that there was pressure in the FBI laboratory to come up with results that favored the government. Dr. Whitehurst's opinion of the FBI laboratory, however, concerned the chemical evidence admitted at trial. It had nothing to do with the fingerprint evidence. Dr. Whitehurst spe-

cifically testified at the Hearing that while he felt a pressure to "avoid flagging the defense, and help [ ] the prosecutor", he did not know whether similar pressures were applied in document analysis, fingerprinting and handwriting. Hearing Tr. at 318–19.

Because Ms. Edelen already testified at trial and because Ajaj failed to meet his burden either before or during the Hearing that Ms. Edelen had any new evidence to offer, I denied the request to call her as a witness. There is no support for the proposition that "newly discovered evidence" includes new innuendos that hypothetically could have been supported by a different line of cross-examination.

anda, go to 2805 and read to me what is on there, and there was a pause and Ms. Fritz said quote, Oh, shit, close quote. And I said to her, Maranda, I know I didn't write "Oh, shit," what did I write? And Ms. Fritz read to me what I read to you, which is, "This is a bluish book with a vase with orchids on it, his writing, it is about chemistry, bombs." And then Ms. Fritz was kind enough, at my request, and I still have it stamped in my office, to send me a copy of this because I couldn't find mine.

Subsequently, and this I don't remember how it came about, I don't remember if I remember it or Mirza asked me or Mr. Ajaj asked me, but subsequently, they had me look for the tapes or maybe I found them. And I found the cassettes. Ms. Fritz asked me if she could listen to them. I said yes, come over. She started to listen and then she decided not to listen. She asked me for a copy of the cassettes. I told her she could have a copy, but I wanted to retain control of the originals, and that if she would pay, I would have somebody make them for her. I gave her a copy of the cassettes.

All of this was done before this motion practice, is my belief. And so, to suggest given those facts, as I recognize she did in her later submission, that maybe I had some confusion about whether or not this was written in Mr. Ajaj's handwriting is mind-boggling to me. I don't know whether it is or isn't, but I do know beyond any doubt that he told me it was and he knew it was important. And I think I had a right to rely on that.

Hearing Tr. at 499–501.

Shortly after this conversation took place, Attorney Campriello learned that New York Times journalist Richard Bernstein was planning a trip to the Middle East to corroborate some of the things Ajaj and Attorney Fritz had told him.

Needless to say, Attorney Campriello was not happy. From a professional standpoint, he did not want to see his name in the paper over criticism of his trial conduct. More importantly, he testified:

> I had pretty good reasons for doing what I did and not doing what I did not do at the trial, and I thought that if I told Mr. Bernstein those reasons there would be no such article in the New York Times . . . I thought that the attorney-client privilege prohibited me from telling Mr. Bernstein those reasons....' [Mr. Bernstein] asked me if I would tell him those reasons if Ms. Fritz and Mr. Ajaj waived the privilege . . . I told him I would be delighted to share the information with him provided they waived the privilege.... [Mr. Bernstein] subsequently told me that they would not waive the privilege, and I obviously did not tell him about what I've testified to here today, and he wrote the article.[89]

*Id.* at 600–01.

On May 15, 1995, based in part on Mr. Bernstein's investigative reporting, Ms. Fritz submitted a letter to the court informing as follows:

> [I]t now appears clear that the Government's most damning assertion against Ajaj—that he himself actually wrote a bombing manual—was simply false.... [A]t least two handwriting experts have confirmed that the government's contention is simply unsupportable. **The expert's analysis will, in fact, show that Ajaj's handwriting is not the same as that contained in the manual.** (Emphasis added).

In her affirmation in support of Ajaj's motion for a new trial, dated June 22, 1995, Ms. Fritz admits that:

> Mr. Campriello has indicated that, during the course of this [pre-trial] interview in August, he understood [Ajaj] to indicate that he had actually written ex-

---

**89.** Mr. Bernstein told Mr. Campriello that "responsible journalism" required him to write his article.

hibit 2805. Mr. Campriello apparently relied on this information in his decision or advice not to consult any handwriting expert.

Fritz Affirmation in Support at 19, n. 9.

She argues, however, that:

not only was that interview with [Ajaj] conducted under "difficult" circumstances [90] and without an interpreter, but also the handwriting in that Exhibit actually differs markedly from Mr. Ajaj's ... More importantly, from his earliest discussions with attorney Lynne Stewart, through his interview a year later with Richard Bernstein, Mr. Ajaj has steadfastly maintained that he did not own or write the materials.

*Id. See also* Ajaj Memorandum at 65–67; Reply Memorandum at 6.

In a footnote to a September 11, 1995 letter to the court, Ms. Fritz further states:

[g]iven the obvious fact that Ajaj did *not, in fact,* write the Exhibit, given the patently obvious differences between Ajaj's writing and the writing in the exhibit, given the circumstances of the client's conversation with Mr. Campriello, given the client's physical condition, and his difficulty in speaking English, the defense position plainly is that the client did not actually state that he wrote the book, but that circumstances resulted in a misapprehension.

In sum, despite the fact that from the beginning of her representation of Ajaj, Ms. Fritz had a conversation with Attorney Campriello about what Ajaj told him regarding Exhibit 2805, that she even had tapes of Attorney Campriello's memorialization of this information and that a copy of the court's authorization to hire a handwriting expert was available in the record, she has advanced the instant claim of newly discovered evidence and ineffective assistance of counsel. She has

advanced it based on an attempt to argue that Attorney Campriello, because of the circumstances of his interview with Ajaj, misunderstood his client. After Attorney Campriello's devastating testimony at the Hearing, Ms. Fritz attempted to rehabilitate herself by questioning Attorney Campriello:

Q: Are you aware that since the earliest moments of my interaction with Ajaj he has declared that it is not his writing?

A: I know that at some point relatively early on he told [you] that it was not his writing. I also know that I asked you what he said about our meeting and what he told me, and you told me that he said he did not recall what he told me. You told me that he said that he was suffering that day from the results of a hunger strike, he was having trouble seeing. I don't remember the rest of it ... I asked you, Maranda, is he denying that he told me these things? And you said, no, he's not denying. He doesn't remember.

Hearing Tr. at 503–4.

Neither Ms. Fritz' speculation that Attorney Campriello misunderstood his client nor her personal conversations with Ajaj, however, are relevant to the claim of ineffective assistance of counsel she has pressed before the court. Under *Strickland,* all that is relevant is the information Attorney Campriello had available to him at the time he made his prudent decision not to call a handwriting expert.

### 3. The Government's Evidence With Respect to the Letter of Introduction to the Terrorist Camp

The final piece of new evidence with respect to materials found in Ajaj's luggage concerns the Letter of Introduction to Camp Khaldan, the terrorist training camp Ajaj attended. Ms. Fritz claims her

---

**90.** With "music playing loudly Ajaj was continuously handcuffed to a chair for six hours without moving and without food, and remained without eyeglasses and in a decidedly weakened physical condition." Fritz Affirmation in Support at ¶ 51.

new evidence shows that the government wrongly argued that Ajaj obtained this letter at the Azam Office in Saudi Arabia. She has apparently found two experts in militant activities in Pakistan who have confirmed that there would have been no "Abdella Azzam House" in Saudi Arabia. Ajaj Memorandum at 67 n. 40.

■ Once again, this evidence cannot be considered "newly discovered", nor could it have affected the outcome of the trial. What was important to the government's argument at trial about the Letter of Introduction was not **where** Ajaj obtained it, but simply that it was in his possession and that other evidence admitted in their case proved that the letter did, in fact, belong to Ajaj. Even if this alleged piece of new evidence were true,[91] at best it could have affected a minor piece of the government's case at trial.

Attorney Campriello also cannot be found to have provided ineffective assistance of counsel in failing to discover this "evidence". First, even if this alleged new evidence would have been admissible and withstood scrutiny on cross-examination, the discussion above makes clear that neither prong of *Strickland* has been implicated.

## V. *Alleged Newly Discovered Evidence Regarding Ajaj's Contacts with Ramzi Yousef*

### A. Summary of the Evidence at Trial

Although imprisoned on the fraudulent passport conviction after he arrived in the United States, the evidence at trial demonstrated that "Ajaj's participation in the conspiracy continued". *Salameh*, 152 F.3d

at 154. In particular, telephone records introduced at trial conclusively showed: (1) that Yousef and Ajaj contacted one another by telephone using Mohammad Abu Khdair as an intermediary; (2) that the same telephone Yousef was using for three-way calls with Ajaj and Abu Khdair was also used to contact chemical companies; (3) that when the court in the Eastern District of New York ordered the return of Ajaj's belongings, including the incriminating bomb making material, Yousef asked if he could receive them;[92] (4) that Abu Khdair and Ajaj made calls to 40 Pamrapo Avenue, Jersey City, New Jersey—the "bomb factory"; and (5) that there were calls to Texas from the bomb factory to Abu Khdair and Imran Mirza, Ajaj's immigration attorney in Texas who eventually received Ajaj's luggage.[93]

### B. The Alleged Newly Discovered Evidence

The alleged newly discovered evidence concerns the government's case regarding the contacts between Ajaj and Yousef while Ajaj was in prison. Ms. Fritz argues that new evidence shows that Ajaj's contacts with Yousef via Mohammed Abu Khdair were entirely innocent and that Ajaj's attempts to get his luggage to Mirza showed his innocent attempt to keep the luggage away from Yousef and avoid the conspiracy. There is no new evidence cited by Ms. Fritz at all, however—just an allegedly new interpretation of the evidence that was already offered or available to be offered at trial. In fact, the record at trial and the testimony of Attorney Campriello at the post-trial hearing confirm that Ms. Fritz' interpretation isn't

---

91. Although referenced in Ms. Fritz' memorandum, no evidence was presented at the Hearing to support this alleged newly discovered evidence.

92. Ajaj initially agreed, but subsequently expressed his concern that Yousef was too busy, that the shipment to Yousef would jeopardize his "business" and "work" and that it would be preferable that Yousef send someone else to get them.

93. Ms. Fritz sought to call Attorney Imran Mirza as a witness at the Hearing. I denied the request based on the failure to demonstrate that Mr. Mirza had any new evidence to offer. *See* Hearing Tr. at 146. It is not new evidence to suggest that Ajaj's attempt to send the luggage to Mirza showed that he did not intend to retain an interest in the conspiracy. This argument on the evidence was available at the time of trial. *See infra* note 95.

even a new interpretation. Attorney Campriello did attempt to argue that Ajaj's contacts with Yousef from prison were innocent.

As such, there is again no legal basis for Ms. Fritz to claim newly discovered evidence or that Attorney Campriello's advocacy on behalf of Ajaj was ineffective.[94] Attorney Campriello understood that as far as this evidence was concerned, "[i]t would have been much better if Mr. Ajaj had never talked to Mr. Yousef while Mr. Ajaj was in prison." Hearing Tr. at 565.

## VI. Newly Discovered Evidence Regarding The Co–Conspirators' Alleged Lack of Knowledge of Ajai

Ms. Fritz' final allegation of newly discovered evidence claims that Ajaj was unknown to others who were a part of the conspiracy. Namely, Emad Salem, the government's informant in the World Trade Center bombing case, and Siddiq Ali, who pleaded guilty in February 1995 before Judge Mukasey, had no knowledge of Ajaj.[95]

▬▬▬▬ This argument has no legal merit. As is clear from the evidence above, Yousef knew Ajaj quite well and Yousef was tried and convicted as the mastermind of the entire conspiracy. *See* Appendix A, note 2 filed herewith under seal. More importantly, it is a fundamental precept of conspiracy law that all co-conspirators need not know one another. *See, e.g., United States v. Labat,* 905 F.2d 18, 21 (2d Cir.1990) ("The defendant need not know the identities of all of the other conspirators, nor all of the details of the conspiracy."); *Blumenthal v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947) ("[T]he law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all of its details or of the participation of others.").

## VII. *Miscellaneous Allegations*

### A. The Testimony of Mohammad Nabil Elmasry

Mr. Elmasry, hired by Attorney Campriello as an interpreter for Ajaj, began working with Attorney Campriello in late January of 1994. Hearing Tr. at 697. Prior to that time, he never had any meetings with Attorney Campriello or Ajaj about the defense strategy. *Id.*

---

**94.** Attorney Campriello admitted at the Hearing that he did not introduce at trial a letter from Douglas Morris, a legal aid attorney, to Eric Bernstein, an Assistant United States Attorney in the Eastern District of New York, confirming that Ajaj asked Morris to ask the government to send the belongings seized from him at Kennedy Airport to Imran Mirza. He further testified, however, that "what [he] did instead was [he had] a stipulation entered into by the government that demonstrated that the luggage that [he] introduced came from Mr. Mirza." Hearing Tr. at 427–28.

I note that this stipulation directly contradicts Ms. Fritz' representation in a post-hearing letter to the court that the fact that "Ajaj directed his attorney in New York to instruct the Government to forward all luggage to ... Imran Mirza ... was not presented to the jury." Fritz Letter dated March 31, 1999 at 1.

**95.** Ms. Fritz also claims that in a public statement that Yousef issued in February 1995, he stated that he is an electronics engineer and explosives expert. Ajaj Memorandum at 76. Apparently, Ms. Fritz seeks to argue from this comment that Yousef therefore had no need for Ajaj or the materials in his luggage. Whatever the import of this excerpt, it cannot overcome the other information Yousef provided in the same statement. Yousef also stated, *inter alia* (1) that he met Ajaj in the terrorist training camp in Afghanistan, (2) that he traveled first class with Ajaj because "First Class passengers are subject to less scrutiny than other passengers", (3) that the material in Ajaj's luggage relating to explosives, weapons and tactics actually belonged to Ajaj and were purchased by Ajaj and (4) that he needed the material in Ajaj's luggage and attempted to arrange to get Ajaj's luggage—via telephone conversations with Ajaj through Abu Khdair—because the materials contained the formula that was necessary to construct the World Trade Center bomb. Yousef Stmt. at 2–3, 5–6.

Mr. Elmasry's testimony elicited at the Hearing at best informed the court that he did not think that Ajaj's handwriting was on "some of the manuals" that resembled Exhibits 2805 and 2814, that he felt Attorney Campriello should get a handwriting expert and that he "laughed" at the "man-made stamps" on Ajaj's passport. *Id.* at 692–94. Mr. Elmasry also informed the court that he was willing to go to the Middle East to meet the family of Yasin Bazayah, but that Attorney Campriello did not think that this was necessary. *Id.* at 696.

None of Mr. Elmasry's testimony provides any helpful insight into the attorney-client relationship between Ajaj and Attorney Campriello or the strategic decisions made by Attorney Campriello and discussed above. It was entirely unhelpful to hear the translator's lay opinion about Ajaj's handwriting, especially without even specifically setting forth for the court which items of evidence he reviewed. It was also entirely unhelpful to hear that, (a) like everyone else who was a party to the trial, Mr. Elmasry knew that Ajaj's passport stamps were false, and (b) Mr. Elmasry was willing travel to the Middle East to gather further cumulative evidence of what Attorney Campriello already argued about the belongings found in Ajaj's luggage.

**B. Trial Counsel's Alleged Failure to Argue and Request a Jury Charge that Ajaj Abandoned or Withdrew from the Conspiracy**

██ Ms. Fritz also alleges that Ajaj received ineffective assistance of counsel as a result of Attorney Campriello's failure to submit a jury charge that Ajaj's imprisonment at the time of the World Trade Center bombing was evidence that he had withdrawn from or abandoned the conspiracy.

As to the first prong of the *Strickland* inquiry, it was obvious from Attorney Campriello's testimony at the Hearing that his decision not to seek a withdrawal charge fell within an "objective standard of reasonableness". Attorney Campriello testified that the defense that he pursued on behalf of Ajaj was that Ajaj was not involved in the conspiracy at all. Hearing Tr. at 406. Attorney Campriello testified that he therefore did not seek to argue withdrawal because "[he] thought it would guarantee [Ajaj's] conviction." *Id.* "[I]t was inconceivable to [him] ... that an American jury would conceivably have acquitted Mr. Ajaj on the theory that he had something to do with this conspiracy, and as a result of his incarceration was no longer responsible for it, and had abandoned it, even though he had not taken any steps to stop it". *Id.* at 407.

In any event, whether Attorney Campriello made an objectively reasonable decision, it is clear that Ajaj cannot "affirmatively prove prejudice" from his attorney's failure to seek a withdrawal instruction. Although the Second Circuit noted in affirming Ajaj's conviction that he was entitled to a jury instruction on withdrawal, it concluded that "the district court's failure to instruct the jury on withdrawal [sua sponte] was not plain error." *Salameh,* 152 F.3d at 150–51. The Court of Appeals concluded that "Ajaj ha[d] not met his burden of persuasion to demonstrate that the jury, properly instructed would have found that Ajaj withdrew from the conspiracy." *Id.* at 150. Importantly, it further noted:

> Other than the fact of his incarceration, Ajaj presented no other evidence at trial to demonstrate that he withdrew from the conspiracy. The government, however, presented compelling evidence that Ajaj, through conversations with Abu [Khdair] and Yousef, retained a stake in the conspiracy during his six-month imprisonment.

*Id.* at 151.

Due to Ajaj's failure to satisfy either prong of the *Strickland* inquiry, Attorney Campriello's counsel on this issue simply cannot be found ineffective.

## C. Post–Hearing Letters and Requests

Clarification is necessary with respect to matters that have occurred outside of Ajaj's Hearing, particularly those which have been presented by Ms. Fritz in her letters to the court. First, in a letter dated March 15, 1999, Ms. Fritz states that "[t]he Government has now been confronted with confirmation, even from Austin Campriello, to the effect that critical Government arguments were fiction, and that Ajaj would not and did not have any involvement in any conspiracy with Ramzi Yousef." Fritz Letter dated March 15, 1999 at 3. Ms. Fritz is well aware that there has never been any such confirmation. *See supra* note 96 (summarizing Yousef's admitted incriminating contacts with Ajaj). *See also* Appendix A, filed herewith under seal.

In the same letter, Ms. Fritz states that "the defense has sought to have the court authorize the defense to retain a handwriting expert, and the court has refused." Fritz Letter dated March 15, 1999 at 3. The Hearing took place for the purpose of examining allegations of newly discovered evidence. The court is not required to authorize fact-finding missions to find new evidence when the defense has completely failed in its burden to demonstrate the efficacy of such mission. Contrary to her arguments and plea to resolve the issue regarding Ajaj's handwriting once and for all, this issue has been resolved. *See supra* Part IV(B)(2).

Finally, the government has made a request for Ms. Fritz to turn over original material utilized in this case that she has kept in storage. In response to the government's concern about the integrity of the materials in storage, Ms. Fritz has argued to the court that her firm's facilities are limited. Accordingly, I order that within ten days of the date of this opinion, all original materials retained by Ms. Fritz be turned over to the custody of the government for storage in a secure government facility with the rest of the material of concern to the World Trade Center bombing case.

## VIII. *Comment*

I write separately here to note that in sum, and as set forth above, there is no legal merit to any of the arguments raised on behalf of any of the Defendants. Nothing that appellate counsel has categorized as "newly discovered evidence" can truly be considered newly discovered or a basis for finding ineffective assistance of trial counsel. Quite troubling particularly, however, is the fact that the lengthy discussion above demonstrates that no reasonable attorney could argue otherwise.

I sat through the trial and observed the lawyers involved in the defense of this case. I know that the accusations of incompetence are totally unfounded. Indeed, I was impressed by the performance of the Defendants' counsel, particularly that of Austin Campriello, who was the sole trial attorney appointed by me under the Criminal Justice Act. His work was clearly outstanding.

On the other hand, as an attorney also appointed by me pursuant to the Criminal Justice Act, the multiple arguments Ms. Fritz has made in the voluminous papers she has filed attacking Attorney Campriello's competence—despite the record he has made here—are troubling. Her claims of newly discovered evidence are based on scraps of information that would have been either cumulative, irrelevant, inadmissible or immaterial at trial and could not have, either in whole or part, led to Ajaj's acquittal. Her arguments are specious at best and seemingly advanced without regard for the pursuit of justice.

It is just this type of "lawyering" which could deter responsible lawyers such as Austin Campriello from taking Criminal Justice Act cases. After all, attorneys wrongly accused of incompetence, either in newspaper stories encouraged by other lawyers or in specious appellate arguments, are forced to suffer not only stress and unfounded harm to their reputation,

but also a serious loss of time and money.[96] Defense counsel, especially when court appointed, owe it to their fellow attorneys not to raise such arguments irresponsibly.

### CONCLUSION

For the reasons set forth above, the Defendants' motions denied in their entirety.

**SO ORDERED.**

---

96. The costs are many and varied. For example, it may well be that under certain professional responsibility insurance policies, even unfounded attacks on competency are required to be reported to the insurer. A history of such claims may result in an increase in the insurance premium.